JEANNE M. LENZER v. DAVID T. FLAHERTY, IN HIS OFFICIAL CAPACITY
AS SECRETARY OF THE DEPARTMENT OF HUMAN RESOURCES, PAUL T. KAYYE,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE DIVISION OF
MENTAL HEALTH, MENTAL RETARDATION AND SUBSTANCE ABUSE SERVICES OF
THE DEPARTMENT OF HUMAN RESOURCES, THOMAS MIRIELLO, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY AS DEPUTY DIRECTOR FOR ALCOHOL AND DRUG
ABUSE SERVICES OF THE DIVISION OF MENTAL HEALTH, MENTAL RETARDATION
AND SUBSTANCE ABUSE SERVICES [OF THE DEPARTMENT OF HUMAN RESOURCES],
DON CUMMINGS, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS DIRECTOR
OF THE DIVISION OF PERSONNEL [MANAGEMENT] SERVICES OF THE DEPARTMENT
OF HUMAN RESOURCES, MICHAEL F. BYRNE, INDIVIDUALLY AND IN HIS OF-
FICIAL CAPACITY AS CHIEF OF THE EMPLOYEE RELATIONS SECTION OF THE DEPART-
MENT OF HUMAN RESOURCES, ROBERT L. BAUCOM, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY AS DIRECTOR OF ARC-BUTNER, AND HARRIET M.
HARMAN, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS ASSISTANT DIRECTOR
OF ARC-BUTNER

No. 9014SC230

(Filed 7 July 1992)

1. **Constitutional Law § 115 (NCI4th)— physician's assistant—
   statements about investigation of patient abuse—termination
   of employment—free speech rights—civil rights action**

   The trial court erred in entering summary judgment for
   defendant State employees in their individual capacities in
   plaintiff's 42 U.S.C. § 1983 action for violation of her federal
   free speech rights where plaintiff was discharged as a physi-
   cian's assistant at an alcohol rehabilitation center after she
   questioned the vigor of investigations into possible mistreat-
   ment of patients at the center; plaintiff's statements addressed
   a matter of public concern; the government's interest in institu-
   tional efficiency did not outweigh plaintiff's free speech in-
   terests; the conduct of defendants was not insulated by the
   doctrine of qualified immunity; and plaintiff's forecast of evidence
   made a prima facie showing that her protected speech played
   a motivating part in the termination of her employment.

   **Am Jur 2d, Constitutional Law §§ 496 et seq.**

   **First amendment protection for public hospital or health
   employees subjected to discharge, transfer or discipline because
   of speech. 107 ALR Fed 21.**

LENZER v. FLAHERTY

[106 N.C. App. 496 (1992)]

2. **Conspiracy § 12 (NCI4th)— civil conspiracy—free speech rights—sufficient forecast of evidence**

The trial court erred in granting summary judgment for defendant State employees individually on plaintiff's claim for civil conspiracy to discharge plaintiff as a physician's assistant at an alcohol rehabilitation center for exercising her free speech rights in reporting possible patient abuse where her forecast of evidence supported her allegations that defendants had an implicit or explicit agreement to prevent the proper investigation of patient abuse at the center and to silence and discredit plaintiff by removing her from her supervising physicians' licenses in order to fire her for lacking the necessary credentials. Furthermore, even if the intra-corporate immunity doctrine were adopted by the Court of Appeals, this doctrine would not bar plaintiff's action for civil conspiracy because a genuine issue of material fact would still exist as to defendants' motives.

**Am Jur 2d, Constitutional Law §§ 496 et seq.**

**First amendment protection for public hospital or health employees subjected to discharge, transfer or discipline because of speech. 107 ALR Fed 21.**

3. **Master and Servant § 13 (NCI3d)— tortious interference with employment contract—sufficient forecast of evidence—qualified privilege of non-outsiders**

The trial court erred in granting summary judgment for defendant supervising physicians individually on the claim of plaintiff physician's assistant for tortious interference with her employment contract where plaintiff's forecast of evidence tended to show that she held a permanent position at an alcohol rehabilitation center with a State classification of Physician Extender II; defendants withdrew their supervision of plaintiff for the purpose of causing plaintiff to lose the certification required to maintain her position with the State; defendants were motivated by unlawful reasons rather than legitimate business interests; and withdrawal of supervision in fact caused the intended effect of plaintiff losing her employment, resulting in damage to plaintiff. Even if defendants are deemed to have the status of non-outsiders, plaintiff's forecast of evidence raises the issue of wrongful purpose which would defeat a non-

LENZER v. FLAHERTY

[106 N.C. App. 496 (1992)]

outsider's qualified privilege to interfere with plaintiff's contract of employment.

**Am Jur 2d, Interference § 45.**

4. **Constitutional Law § 86 (NCI4th)— § 1983 claim—Secretary of DHR—official capacity—reinstatement to job**

The trial court erred in dismissing plaintiff's 42 U.S.C. § 1983 claim against the Secretary of DHR in his official capacity seeking reinstatement to her job since State officials acting in their official capacities are "persons" reachable under § 1983 when sued for prospective equitable relief.

**Am Jur 2d, Civil Rights § 17.**

5. **Constitutional Law § 86 (NCI4th)— § 1983 claims—State agents—official capacities—damages claims barred**

The trial court properly dismissed plaintiff's § 1983 claims for monetary damages against State officials and agents in their official capacities since they are not "persons" covered by § 1983 when the remedy sought is monetary damages.

**Am Jur 2d, Civil Rights § 17.**

6. **Constitutional Law § 115 (NCI4th)— free speech violation— State agents—individual capacities—no claim under N.C. Constitution**

A plaintiff has no direct claim under the N.C. Constitution against State agents sued in their individual capacities for alleged violations of her free speech rights.

**Am Jur 2d, Civil Rights § 17.**

7. **Master and Servant § 10.2 (NCI3d)— reporting of patient abuse—no statutory claim for retaliatory discharge**

While N.C.G.S. § 122C-66 requires reporting of known or suspected abuse of patients in facilities licensed under Chapter 122C, this statute does not create a cause of action for retaliatory discharge by an employee discharged for reporting suspected patient abuse.

**Am Jur 2d, Master and Servant § 60.**

**8. Master and Servant § 10.2 (NCI3d) — wrongful discharge — free speech — report of patient abuse — public policy exception**

The discharge of an employee for exercising her free speech rights guaranteed by the N.C. Constitution or for reporting patient abuse pursuant to N.C.G.S. § 122C-66 gives rise to a cause of action for wrongful discharge under the public policy exception to the employment-at-will doctrine.

**Am Jur 2d, Master and Servant § 60.**

**9. Constitutional Law § 115 (NCI4th); State § 4.2 (NCI3d) — State officials — official capacities — sovereign immunity — free speech violation — other claims**

The trial court erred in holding that plaintiff's claims against State officials in their official capacities for violation of her free speech rights protected by the N.C. Constitution were barred by sovereign immunity. However, the trial court properly dismissed plaintiff's claims against State officials in their official capacities for civil conspiracy, wrongful discharge and tortious interference with contract on the ground that such claims were barred by sovereign immunity.

**Am Jur 2d, Constitutional Law § 282.**

APPEAL by plaintiff from orders entered 27 September 1989 and 16 October 1989 by *Judge Robert H. Hobgood* in DURHAM County Superior Court. Heard in the Court of Appeals 21 February 1991.

*Edelstein, Payne & Nelson, by M. Travis Payne, for plaintiff-appellant.*

*Christic Institute South, by P. Lewis Pitts, Jr., for plaintiff-appellant.*

*Attorney General Lacy H. Thornburg, by Senior Deputy Attorney General Ann Reed and Special Deputy Attorney General John R. Corne, for defendant-appellees.*

*Faison & Brown, by O. William Faison and Reginald B. Gillespie, Jr., for defendant-appellees Baucom and Harman.*

PARKER, Judge.

In this action alleging unlawful separation from employment, plaintiff, a former physician's assistant ("PA") at the Alcohol Rehabilitation Center in Butner, North Carolina ("ARC"), predicates defendants' liability on violation of her free speech rights under the United States and North Carolina Constitutions, civil conspiracy, tortious interference with economic relations, wrongful discharge and harassment in violation of N.C.G.S. § 122C-66(b). N.C.G.S. § 122C-66 makes it a crime to knowingly injure mentally or emotionally disabled patients in State facilities and provides guidelines for the reporting of actual or suspected abuse or exploitation of such patients.

Plaintiff contends she was fired for reporting suspected patient abuse at the ARC to authorities in the State Bureau of Investigation ("SBI") and the State Department of Human Resources ("DHR") in Raleigh. Plaintiff sues six State employees, in both their individual and official capacities, for compensatory and punitive damages. She sues the Secretary of DHR in his official capacity only, seeking reinstatement and protection for other employees or patients reporting suspected abuse.

The six State employees ("defendant employees") held the following positions at the time of plaintiff's discharge: (i) Dr. Harman, Lenzer's primary supervisor, was a Physician III at the ARC; (ii) Dr. Baucom, plaintiff's backup supervisor, was director of the facility; (iii) Dr. Kayye was director of DHR's Division of Mental Health, Mental Retardation and Substance Abuse Services ("Division"); (iv) Miriello was deputy director for Alcohol and Drug Abuse Services in the Division; (v) Cummings was director of the DHR Division of Personnel Management Services; and (vi) Byrne was chief of the Employee Relations Section in Cummings' division. Defendant employees became involved with plaintiff under the following circumstances.

Plaintiff began working at the ARC in January 1983. In late January or early February 1985 one of plaintiff's co-workers, a male health care technician ("Attendant N"), allegedly told plaintiff he was having homosexual relations with a patient who had been discharged from the facility. Attendant N also told plaintiff these relations had occurred almost nightly while the patient was still a resident at the facility.

**LENZER v. FLAHERTY**

[106 N.C. App. 496 (1992)]

Plaintiff reported this information about Attendant N to Dr. Harman, her immediate supervisor, and to Dr. Baucom. Dr. Baucom consulted the client advocate to determine whom to contact and how to proceed. The client advocate let plaintiff know her allegations were being investigated and Dr. Baucom would involve the SBI. Plaintiff also contacted the SBI on her own. According to plaintiff, the SBI indicated it was the appropriate agency to investigate plaintiff's dual concerns about patient exploitation and the operation of a male prostitution ring in Raleigh, to which she believed Attendant N might be referring ex-clients from the ARC.

Attendant N denied any misconduct when confronted on 8 March 1985. The patient also denied sexual relations with the attendant. Management gave Attendant N a warning for breaching confidentiality by giving out a male patient's name, without the patient's permission, as a referral to a modeling agency. Defendant Byrne explained the decision to give Attendant N a warning as follows.

[T]he reason that particular course of action was taken was due to the fact that neither the internal investigation of the allegations of his misconduct with patients, nor the SBI's investigation of the same incidents generated any substantial information sufficient to justify just cause for taking a more stringent kind of disciplinary action.

In late February 1986 a former patient phoned the ARC to complain of sexual exploitation in connection with the same attendant and a man introduced to the patient by Attendant N. The patient was readmitted to the ARC. Dr. Baucom again involved the client advocate, the SBI and public safety officers in interviews with patients and staff concerning this case. Plaintiff was questioned but had no first-hand knowledge of the case. In March 1986 Dr. Baucom sent defendants Miriello and Byrne written summaries of the status of these investigations, at Miriello's request. The record contains a handwritten statement by the victim in the 1986 case stating he had been threatened by Attendant N's friend, Attendant N had made sexual overtures to him, and Attendant N had told this patient about getting in trouble over having had sex with another patient until that patient had the "good sense" to remain silent. The 1986 victim confirmed these statements in a taped oral interview with Dr. Baucom.

LENZER v. FLAHERTY

[106 N.C. App. 496 (1992)]

In March 1986 plaintiff reported her general concerns about this second case involving Attendant N directly to the SBI. In mid-April plaintiff also called Dr. Kayye, the director of the Division, and then spoke to Miriello, alleging that the ARC administration might be covering up such incidents and that she feared reprisal for her reporting possible cases of abuse. Plaintiff furnished a letter to Miriello at his request. Miriello shared that letter with Cummings and Byrne. A few days later Cummings told plaintiff, who called him on 21 April to say she was afraid of being disciplined for reporting to the SBI, that DHR was aware of the allegations and investigations at the ARC.

Dr. Kayye believed plaintiff was falsely accusing her supervisors of covering up abuse but recognized plaintiff felt she was being harassed on account of her allegations. The other physician at the ARC, Dr. Shaver, viewed plaintiff's allegations of cover-up seriously.

> I admired [plaintiff's] sense of conscience and her concern, and I had no reason to distrust her personal evaluation of the situation. I admired her courage and her commitment to this kind of principle.

Dr. Shaver noticed that plaintiff's treatment by staff and supervisors changed after plaintiff began making these reports.

DHR employees held several meetings to discuss plaintiff's perceptions and allegations. By the end of April, Cummings and Byrne had reviewed plaintiff's personnel file. Finding no evidence of any progressive discipline in that file, Cummings and Byrne concluded plaintiff had not been subjected to retaliation. Dr. Kayye, Cummings and Byrne all understood that physicians could have PAs removed from their medical licenses. Dr. Kayye, in fact, strongly expressed his conviction that a physician needed to be comfortable with any medical personnel practicing on the physician's license.

On 12 May 1986 Dr. Baucom learned for the first time from Dr. Kayye of plaintiff's phone calls to DHR about the second case involving Attendant N. According to Dr. Baucom, Dr. Kayye told him that Baucom "needed to go ahead and get rid of" plaintiff but Dr. Kayye did not give a reason. The sworn testimony is also to the effect that Dr. Baucom and Miriello were shocked at Dr. Kayye's suggestion. According to Byrne, Dr. Kayye used even

more colorful language, asking Dr. Baucom if he had yet fired that bitch or gotten the bitch off his medical license.

On 16 May Dr. Baucom, Byrne and Miriello met at the ARC to discuss the handling of plaintiff's allegations and plaintiff's job performance. At that meeting Dr. Baucom learned for the first time about plaintiff's contacts with the SBI, her written report to Miriello and her allegations that the administration was covering up abuse and that Dr. Harman had started holding non-disciplinary, supervisory sessions with plaintiff in order to harass plaintiff into keeping quiet. According to Dr. Baucom, the 16 May meeting focused "[p]retty much [on] what was appropriate action to take with regards to [Attendant N] and also in regards to [plaintiff]." At this meeting Byrne again mentioned a physician's option of withdrawing supervision from a PA. Dr. Baucom was aware that plaintiff had never received any formal discipline, as were the Raleigh officials. The meeting on 16 May lasted at least three hours.

As a result of that meeting, Dr. Baucom and Dr. Harman notified the State Board of Medical Examiners by letter on 19 May of their withdrawal of supervision from plaintiff, effective 20 May 1986. The letter stated no reason for the physicians' decision to withdraw supervision. Before 20 May DHR officials also informed the Secretary of DHR of the planned disposition of plaintiff's case. On 20 May Dr. Baucom and Dr. Harman met with plaintiff to inform her of the physicians' action with the State Board. At that meeting plaintiff admitted she no longer trusted her supervisors. Dr. Baucom informed plaintiff she was fired and had one hour to leave the premises. The same day Dr. Baucom informed Dr. Shaver that he and Dr. Harman could no longer supervise plaintiff on account of her insubordinate conduct in contacting SBI and DHR personnel in Raleigh.

Prior to her termination plaintiff had received consistently high annual performance ratings, including an appraisal of "very good" for 1985. Defendants do not dispute plaintiff's high level of competence in physical diagnosis and treatment. However, defendants point out that Dr. Harman complained to Byrne in mid-1985 about her difficulties in supervising plaintiff. According to Byrne, Dr. Harman consulted with him in May 1985 about plaintiff's tendencies to undertake tasks outside the scope of plaintiff's professional responsibilities. Byrne informed Dr. Harman that she had the option of writing up plaintiff's infractions. According to Dr. Harman's

testimony, the problems with plaintiff confining herself to her medical role had come up as early as 1984. However, Dr. Harman did not begin putting her criticism of plaintiff's work, directed primarily at plaintiff's counseling of patients about childhood abuse, into writing until 25 February 1986. In their answers to plaintiff's complaint, Dr. Harman and Dr. Baucom both admit that "[p]laintiff's practices with regard to the areas criticized by [Dr.] Harman were not substantially different from the practices [plaintiff] had followed previously." Plaintiff received the first write-up in early March and a second write-up in early April 1986. Plaintiff's discharge followed on 20 May.

In plaintiff's subsequent administrative grievance procedure, DHR upheld her termination by letter from the DHR secretary dated 5 August 1986. DHR based its decision to affirm plaintiff's dismissal on section 9 of the *State Personnel Manual*: "Failure to maintain the required credentials [of a job in State service] is a basis for immediate dismissal without prior warning." The statutory and regulatory basis for this credentials requirement as it applies to plaintiff's case is not in dispute. In order to be registered with the State Board of Medical Examiners, plaintiff needed supervision by two licensed physicians, a primary supervisor and a backup. N.C.G.S. § 90-18(13)b; N.C. Admin. Code tit. 21, r. 32D.0001 & .0002 (December 1984) (repealed 1 June 1990, replaced by r. 32L.0001 & .0009). A PA lacks the minimum credentials to practice in this State if she has no supervising physicians. N.C.G.S. § 90-18.1(a); N.C. Admin. Code tit. 21, r. 32D.0002 (December 1984) (repealed 1 June 1990, replaced by r. 32L.0004(c) ). In affirming plaintiff's termination, DHR also took the position that the grievance procedure did not permit inquiry into the physicians' reasons for removing plaintiff from their licenses.

Plaintiff filed this action on 15 May 1987. On 22 July 1987 all defendants moved for dismissal pursuant to Rule 12(b)(1,) (2) and (6) of the North Carolina Rules of Civil Procedure and each thereafter filed a detailed answer. Following substantial discovery, on 30 June 1989 defendants moved for summary judgment and filed 24 exhibits with the trial court. Plaintiff opposed this motion with a 47-page summary of facts purportedly established by 28 exhibits accompanying plaintiff's response to the summary judgment motion. The parties' exhibits on appeal run to more than 1,700 pages and include affidavits, selected excerpts from voluminous depositions and extracts from personnel files of a number of ARC

employees who were disciplined for a variety of personal and job-related problems by means less drastic than discharge. After hearing on the motions, the trial court took defendants' motions for dismissal and summary judgment under advisement and subsequently ruled against plaintiff on each of her claims.

The trial court's order and amended order explain the legal bases for the court's rulings in some detail. The trial judge found no genuine issues of material fact and granted summary judgment to defendant employees, in their individual capacity, on plaintiff's claim for damages under 42 U.S.C. section 1983, premised on alleged retaliation for exercise of her First Amendment rights, as well as on plaintiff's claims for civil conspiracy and tortious interference with contract. On plaintiff's section 1983 claim for monetary relief against defendant employees in their official capacity, the trial court ruled that dismissal was appropriate under Rule 12 of the North Carolina Rules of Civil Procedure in that the DHR employees were not "persons" under section 1983 and sovereign immunity barred such claims.

The trial court rested dismissal of four other claims against defendant employees in their official capacity on sovereign immunity as well: violation of plaintiff's rights under the State Constitution, violation of N.C.G.S. § 122C-66(b), wrongful discharge and civil conspiracy. The claim for tortious interference with contract, brought solely against plaintiff's supervising physicians, was also held barred by sovereign immunity as to the physicians' conduct in their official capacity. The court also dismissed the claim for injunctive relief against the secretary of DHR in his official capacity in light of the court's judgment against plaintiff as to all remaining defendants.

The trial court took a different approach to its dismissal of three claims brought against defendant employees individually. As to plaintiff's wrongful discharge claim, the court found that the allegations did "not fall within any exception to the employment-at-will doctrine," including the public policy exception urged by plaintiff. As to the State constitutional and N.C.G.S. § 122C-66(b) claims for monetary damages, the court ruled that "said claims are not cognizable in this State."

We affirm in part and reverse and remand in part. As discussed hereinafter, the trial court erred in granting summary judgment to defendant employees individually on plaintiff's claims for

violation of section 1983, civil conspiracy and tortious interference with contract. The court also erred in dismissing the wrongful discharge claim against defendant employees in their individual capacity and in dismissing plaintiff's section 1983 claim for injunctive relief against defendant Flaherty in his official capacity. Dismissal of the section 1983 claims against the remaining defendants in their official capacity was correct. The court also properly dismissed plaintiff's State statutory and State constitutional claims against defendant employees individually. The court erred, however, in dismissing the State constitutional claim asserted against defendant employees in their official capacity. Finally, dismissal of the State statutory, wrongful discharge, civil conspiracy and tortious interference with contract claims against defendant employees in their official capacity was proper.[1]

## I. Summary Judgment

The summary judgment order relieved defendant employees of liability in their individual capacity for violation of plaintiff's federal constitutional rights and civil conspiracy. It also relieved Dr. Baucom and Dr. Harman of individual liability for tortious interference with contract. Summary judgment on these claims was error. Summary judgment is only appropriate where the parties' pleadings and discovery materials establish there is no genuine issue of material fact. *McLaughlin v. Barclays American Corp.*, 95 N.C. App. 301, 382 S.E.2d 836, *cert. denied*, 325 N.C. 546, 385 S.E.2d 498 (1989). Giving plaintiff as non-movant all favorable inferences that may reasonably be drawn from the evidence before the trial court, as we must, we find that each of these three claims raises controverted factual issues sufficient to withstand defendants' motion under N.C.G.S. § 1A-1, Rule 56(c).

A State official will be personally answerable for damages under section 1983 only where qualified immunity is not available to shield the official from liability for deprivation of federal rights. *Corum v. University of North Carolina*, 330 N.C. 761, 772, 413 S.E.2d 276, 283 (1992). To maintain her claim under section 1983,

---

1. For organizational purposes, the legal issues in this opinion are discussed as they were disposed of in the trial court's orders, namely, by summary judgment or as Rule 12(b)(6) dismissals; however, nothing in this opinion is intended in any way to suggest a modification of that part of Rule 12(b) which provides that where "matters outside the pleading are presented to and not excluded by the court, the [Rule 12(b)(6)] motion shall be treated as one for summary judgment."

plaintiff must first establish that the conduct was protected by showing that (i) the speech pertained to a matter of public concern and (ii) the public concern outweighed the governmental interest in efficient operations. *See Connick v. Myers*, 461 U.S. 138, 75 L.Ed.2d 708 (1983). The determination of whether the conduct is protected activity is a question of law. *Id.* at 148 n.7, 75 L.Ed.2d at 720 n.7.

[1] Defendants argue that summary judgment in their favor on plaintiff's section 1983 claim for violation of her federal free speech rights should be affirmed, in that (i) plaintiff's statements about a possible lack of vigor in investigating patient abuse at the ARC did not address a matter of public concern; (ii) even if plaintiff's speech touched an issue of public concern, the governmental interest in efficient institutional operations outweighed plaintiff's interest in making public comment; and (iii) even if plaintiff's interests were paramount, defendants were entitled to qualified immunity because their conduct was not clearly unlawful under existing precedent.

As to defendants' first argument, we cannot agree that plaintiff was speaking out for personal reasons unrelated to a matter of public concern when she questioned the vigor of investigations into possible mistreatment of patients at the ARC. Viewed in the light most favorable to plaintiff, the evidence is that plaintiff raised sincere concerns about patient abuse and that these concerns had some basis in fact. Evidence in the record suggests, for instance, that the ARC administration, knowing of an incident of sexual misconduct in 1983 between a male PA and a patient, sought to keep that information from going beyond the ARC. The record also reveals that Attendant N was treated somewhat indulgently despite his apparent guilt of sexual abuse of patients. About a month after plaintiff's discharge in May 1986, Attendant N received notice that he was terminated. One of the stated grounds was falsification of his employment application in 1975. When Attendant N challenged his firing, he was permitted to resign under a settlement guaranteeing him a neutral employment reference. Byrne's personal opinion was that Attendant N had been involved in sexual misconduct; and in Byrne's view Dr. Baucom had formed the same opinion. At her deposition Dr. Harman also testified that plaintiff's account of the 1985 conversation with Attendant N about his supposed sexual adventures with patients was credible. Finally, evidence in the record permits the inference that with the 1986 patient

incident, the SBI was not immediately contacted by the ARC administration and the patient was assigned to Dr. Shaver rather than to plaintiff with instructions that the circumstances surrounding the patient's return not be written up in the patient's chart. This evidence does not support defendants' argument that plaintiff was making "false allegations of a cover up to create a whistleblower claim in the event of her discharge" for refusal to comply with Dr. Harman's instructions about how plaintiff was to do her job. Patient abuse in any form in government operated hospitals is a matter of public concern.

Next defendants argue that their interest in institutional efficiency outweighed any free speech interests plaintiff might have had. We agree that a public employer may have certain institutional interests that must be weighed against an employee's rights to speak out on a matter of public concern. See, e.g., Connick v. Myers, 461 U.S. 138, 75 L.Ed.2d 708 (1983); Pickering v. Board of Education, 391 U.S. 563, 20 L.Ed.2d 811 (1968) (discussing the balancing of competing employee and employer interests). However, defendants' exhibits in the record are insufficient to demonstrate as a matter of law, as defendants argue, that "[p]laintiff's continued employment with the ARC would inevitably have fostered disharmony and adversely affected discipline and morale in the work place, which would have impaired the efficiency of the institution." The record before us fails to support a reasonable apprehension that plaintiff's speech would damage staff morale or institutional efficiency. See Jurgensen v. Fairfax County, 745 F.2d 868, 879-80 (4th Cir. 1984).

Finally, defendants assert that their conduct is insulated from liability by the doctrine of qualified immunity. In general, qualified immunity protects government officials from personal liability for performing discretionary functions to the extent that such conduct does not violate " 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " Corum, 330 N.C. at 772-73, 413 S.E.2d at 284 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L.Ed.2d 396, 410 (1982) ).

On the initial issue to be examined under the Harlow test — whether the specific right allegedly violated was "clearly established" — we conclude that public speech about suspected patient abuse in State facilities merits legal protection. This conclusion is fortified by the existence in this State of statutory provisions

governing the reporting of such patient abuse. *See, e.g.*, N.C.G.S. § 122C-66. The second issue to be examined under the *Harlow* test is whether reasonable persons in defendants' position could have failed to appreciate that their conduct would violate the specific rights alleged by plaintiff. Applying this part of the *Harlow* test to the present case requires "factual determinations respecting [defendants'] conduct and its circumstances." *Collinson v. Gott*, 895 F.2d 994, 998 (4th. Cir. 1990) (Phillips, J., concurring). Although an employer's "subjective beliefs about the legality of the demotion [or discharge] are irrelevant," *Corum*, 330 N.C. at 777, 413 S.E.2d at 286 (citing *Anderson v. Creighton*, 483 U.S. 635, 643, 97 L.Ed.2d 523, 532-33 (1987) ), factual determinations about defendants' motives may also have to be made where motivation is an element of the cause of action.

> [The] "purely 'objective' test cannot in the end avoid the necessity to inquire into official motive or intent or purpose when such states of mind are essential elements of the constitutional right allegedly violated."
>
> . . . .
>
> [w]here the defendant's subjective intent is an element of the plaintiff's claim and the defendant has moved for summary judgment based on a showing of the objective reasonableness of his actions, the plaintiff may avoid summary judgment only by pointing to specific evidence that the officials' actions were improperly motivated.

*Corum*, 330 N.C. at 773, 413 S.E.2d at 284-85 (quoting *Collinson v. Gott*, 895 F.2d 994, 1001-02 (4th Cir. 1990) (Phillips, J., concurring) (citations omitted).

In challenging an adverse employment decision for violation of constitutional rights, an employee establishes a prima facie case by showing that protected activity was a substantial or motivating factor in the employer's decision. *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 50 L.Ed.2d 471 (1977). This prima facie showing shifts the burden to the employer to show, by a preponderance of the evidence, that the adverse decision would have been made in the absence of the protected activity. *Id.* In the present case plaintiff's forecast of evidence meets the prima facie threshold for showing that her protected speech played a motivating part in plaintiff's termination.

Although evidence of retaliation in a case such as this one may often be completely circumstantial, the causal nexus between protected activity and retaliatory discharge must be something more than speculation. *Brooks v. Stroh Brewery Co.*, 95 N.C. App. 226, 237, 382 S.E.2d 874, 882, *disc. rev. denied*, 325 N.C. 704, 388 S.E.2d 449 (1989). Plaintiff's evidence on this record goes beyond speculation and conjecture and meets the quantum of sufficient specific evidence required by *Corum* in this type case. 330 N.C. at 778-79, 413 S.E.2d at 287. Therefore, defendants could only prevail at the summary judgment stage by showing, to counter plaintiff's prima facie case, that there is no genuine issue of fact as to the legitimacy of the reason motivating their decision regarding plaintiff. This showing is not made on the record now before this Court. Since defendants concede plaintiff's alleged deviation from ARC policies and protocols had long been tolerated without any disciplinary action, we cannot say plaintiff's discharge would have occurred notwithstanding the protected conduct at issue in this case. Defendants' longstanding tolerance of plaintiff's alleged insubordination throws into question the credibility of defendants' account of their motivation in firing plaintiff. If defendants' "motive was to suppress speech, one result is reached, while if the motive was to punish insubordination, another conclusion results." *Corum*, 330 N.C. at 777, 413 S.E.2d at 286. In the present case defendants' motives in having plaintiff's supervisors withdraw plaintiff from their medical licenses is a material, controverted issue of fact bearing on the question of whether defendants violated plaintiff's free speech rights under federal law. Under the *Harlow* test as discussed in *Corum*, then, defendants have not established their entitlement to summary judgment, as a matter of law, on the basis of the defense of qualified immunity. Accordingly, we reverse summary judgment in favor of defendants in their individual capacity on plaintiff's section 1983 claim and remand that claim to the trial court.

[2] We turn next to plaintiff's claim against defendants individually for monetary relief based on civil conspiracy.

A claim for damages resulting from a conspiracy exists where there is an agreement between two or more persons to do an unlawful act or to do a lawful act in an unlawful way, and, as a result of acts done in furtherance of, and pursuant to, the agreement, damage occurs to the plaintiff. In such a case, all of the conspirators are liable, jointly and several-

ly, for the act of any one of them done in furtherance of the agreement.

*Fox v. Wilson*, 85 N.C. App. 292, 301, 354 S.E.2d 737, 743 (1987) (citations omitted). Plaintiff's allegations of civil conspiracy are that defendants had an implicit or explicit agreement (i) to silence and discredit plaintiff by removing her from her supervising physicians' licenses in order to fire her on the pretext that she lacked the necessary credentials and (ii) to prevent the proper investigation of patient abuse at the ARC. Pursuant to that agreement, plaintiff alleged, *inter alia*, defendants discharged plaintiff, forced one or more other employees who had knowledge of abuse to resign, permitted Attendant N to resign with a promise not to disclose to his prospective employers the allegations of sexual misconduct against him at the ARC, manipulated patients into withdrawing or moderating complaints of sexual exploitation and attempted to obtain false affidavits against plaintiff and other employees who were openly critical of administrative handling of sexual abuse complaints.

The evidence in the record is sufficient to raise more than a conjecture or suspicion as to the existence of an agreement to discharge plaintiff for exercise of her First Amendment rights in reporting potential patient abuse. *See Dickens v. Puryear*, 302 N.C. 437, 276 S.E.2d 325 (1981). As the record raises genuine issues of material fact with respect to this allegation and others relating to the proper investigation of patient abuse, summary judgment was improper.

Further, we do not agree with defendants' contention that this common law cause of action for civil conspiracy is barred as a matter of law by the intra-corporate immunity doctrine. Our research discloses no North Carolina case in which the doctrine has been adopted as a defense to civil conspiracy. Among the federal circuit courts, the authorities are split as to the application of the doctrine in actions arising under federal statutes, in particular 42 U.S.C. section 1985(3). *See Buschi v. Kervin*, 775 F.2d 1240, 1252 (4th Cir. 1985), and *Garza v. City of Omaha*, 814 F.2d 553, 556 (8th Cir. 1987). Moreover, even if we were to adopt the doctrine, on the evidence in this record, a genuine issue of material fact would still exist as to defendants' motive. As the court stated in *Buschi*,

the doctrine is inapplicable "where the plaintiff has alleged that the corporate employees were dominated by personal motives or where their actions exceeded the bounds of their authority."

775 F.2d at 1252 (citation omitted). We, therefore, reverse that portion of the trial court's order granting summary judgment to defendant employees on plaintiff's civil conspiracy claim.

[3]   We next address plaintiff's claim against Dr. Baucom and Dr. Harman individually for tortious interference with contract. In order to establish a claim for tortious interference with an existing contract, plaintiff needed to forecast evidence of the following elements:

First, that a valid contract existed between the plaintiff and a third person, conferring upon the plaintiff some contractual right against the third person. *Second*, that the outsider had knowledge of the plaintiff's contract with the third person. *Third*, that the outsider intentionally induced the third person not to perform his contract with the plaintiff. *Fourth*, that in so doing the outsider acted without justification. *Fifth*, that the outsider's act caused the plaintiff actual damages.

*Childress v. Abeles*, 240 N.C. 667, 674, 84 S.E.2d 176, 181-82 (1954) (citations omitted). Plaintiff's complaint and discovery documents give an evidentiary forecast, adequate to withstand defendants' motion for summary judgment, that the PA position she held at the ARC was a permanent position with a State classification of Physician Extender II; that defendants Baucom and Harman withdrew supervision from plaintiff for the purpose of causing her to lose the certification required for plaintiff to maintain her position with the State; that defendants were motivated by unlawful reasons rather than legitimate business interests; and that withdrawal of supervision in fact caused the intended effect of plaintiff losing her employment, resulting in damage to plaintiff. Under our case law plaintiff's cause of action for tortious interference with contract lies even though her employment contract was terminable at will. *Smith v. Ford Motor Co.*, 289 N.C. 71, 85, 221 S.E.2d 282, 290, 79 A.L.R.3d 651, 662 (1976); *Sides v. Duke University*, 74 N.C. App. 331, 345-48, 328 S.E.2d 818, 828-30, *disc. rev. denied*, 314 N.C. 331, 333 S.E.2d 490 (1985).

Defendants Baucom and Harman contend they cannot be liable for tortious interference with contract in that their supervisory

status dictates they were not outsiders to plaintiff's employment contract. It is true that so-called "non-outsiders" often enjoy qualified immunity from liability for inducing their corporation or other entity to breach its contract with an employee. *See, e.g., Smith v. Ford Motor Co.*, 289 N.C. 71, 221 S.E.2d 282, 79 A.L.R.3d 651 (1976); *Wilson v. McClenny*, 262 N.C. 121, 136 S.E.2d 569 (1964) (considering corporate stockholders and directors, with interest in activities of corporation and duty to advise or direct such activities). However, even if defendants Baucom and Harman were deemed to have the status of non-outsiders, such status "is pertinent only to the question [of the] justification for [defendants'] action." *Smith*, 289 N.C. at 88, 221 S.E.2d at 292, 79 A.L.R.3d at 665. The qualified privilege of a non-outsider is lost if exercised for motives other than reasonable, good faith attempts to protect the non-outsider's interests in the contract interfered with. *Id.* at 91, 221 S.E.2d at 294, 79 A.L.R.3d at 668. Plaintiff's forecast of evidence raises precisely the issue of wrongful purpose, which purpose would defeat a non-outsider's qualified privilege to interfere. For the foregoing reasons, we reverse the order of the trial court granting summary judgment to defendants Baucom and Harman in their individual capacity on plaintiff's claim for tortious interference with contract.

## II. SECTION 1983 CLAIMS: OFFICIAL CAPACITY

[4] The trial court erred in dismissing the section 1983 claim against defendant Flaherty in his official capacity. For purposes of a claim for prospective equitable relief from violation of federal constitutional law, State officials acting in their official capacity are "persons" reachable under section 1983. *Kentucky v. Graham*, 473 U.S. 159, 167 n.14, 87 L.Ed.2d 114, 122 n.14 (1985). Neither sovereign immunity nor qualified immunity will bar such a claim. *Corum v. University of North Carolina*, 330 N.C. 761, 771, 413 S.E.2d 276, 283 (1992). Therefore, we reverse as to defendant Flaherty.

[5] However, State officials and agents are not "persons" covered by section 1983 when the remedy sought is monetary damages. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 105 L.Ed.2d 45 (1989). Thus the trial court did not err in dismissing the section 1983 claims for monetary damages against all remaining defendants in their official capacity and we affirm that portion of the trial court's order.

III. RULE 12 DISMISSALS: INDIVIDUAL CAPACITY

**[6]** Finding no precedent for plaintiff's State constitutional claims, the trial court ruled these claims were not cognizable in North Carolina. Our Supreme Court has since recognized a direct cause of action for violation of an individual's protected speech rights under Article 1, Section 14 of the State Constitution. *Corum v. University of North Carolina*, 330 N.C. 761, 413 S.E.2d 276 (1992). However, *Corum* expressly held that State constitutional claims are not cognizable against State actors in their individual capacity. *Id.* at 788, 413 S.E.2d at 293. Therefore, we affirm the trial court's dismissal of plaintiff's State constitutional claims against defendant employees in their individual capacity.

**[7]** Plaintiff also seeks to bring a claim against defendant employees individually for monetary damages under N.C.G.S. § 122C-66(b). Plaintiff argues that the legislature has provided express protection against retaliatory discharge for State employees such as plaintiff by enacting the following provision.

> An employee of a facility who . . . has knowledge of [pain or injury to a client caused by another employee or volunteer, "other than as a part of generally accepted medical or therapeutic procedure," N.C.G.S. § 122C-66(a),] . . . shall report the violation . . . to authorized personnel designated by the facility. No employee making a report may be threatened or harassed by any other employee or volunteer on account of the report. Violation of this subsection is a misdemeanor punishable by a fine, not to exceed five hundred dollars ($500.00).

N.C.G.S. § 122C-66(b) (1985).

This statutory provision is criminal in nature and does not create the sweeping remedy urged by plaintiff. While N.C.G.S. § 122C-66 requires reporting of known or suspected abuse of patients in facilities subject to the licensing requirements of Chapter 122C such as the ARC, the language of this provision does not create a cause of action for retaliatory discharge against an employer by an employee discharged in retaliation for reporting suspected patient abuse. For this reason we affirm the dismissal of this claim.

**[8]** As to plaintiff's claim for wrongful discharge, the facts of this case fit within the public policy exception to the employment-at-will doctrine as that exception has recently been delineated by our Supreme Court. In *Amos v. Oakdale Knitting Co.*, 331 N.C.

348, 353, 416 S.E.2d 166, 169 (1992), the Court declared that "at the very least public policy is violated when an employee is fired in contravention of express policy declarations contained in the North Carolina General Statutes." That observation, in our view, applies with equal force to rights guaranteed by the State Constitution such as plaintiff's free speech claim. Similarly, discharge resulting from a report made pursuant to N.C.G.S. § 122C-66 would give rise to a cause of action for wrongful discharge under the public policy exception to the at-will doctrine. Therefore, we reverse the dismissal of the wrongful discharge claim.

IV. DISMISSAL OF OTHER CLAIMS: OFFICIAL CAPACITY

[9]   *Corum* permits suit against State actors in their official capacity for violation of the free speech rights protected by the North Carolina Constitution. The trial court erred in holding such claims barred by sovereign immunity. *See Corum*, 330 N.C. at 785-86, 413 S.E.2d at 292. Under the standard reviewed in our earlier discussion of plaintiff's section 1983 claim against defendant employees in their individual capacity, the allegations of plaintiff's complaint state a cause of action for violation of plaintiff's free speech rights protected under the North Carolina Constitution. We, therefore, reverse the portion of the trial court's order dismissing the State constitutional claim against defendant employees in their official capacity.

On the other hand, the claim against defendant employees in their official capacity for violation of N.C.G.S. § 122C-66(b) was correctly dismissed on the ground that this statute creates no civil cause of action against an employer for retaliatory discharge, as we have already discussed. Dismissal of plaintiff's claims for civil conspiracy and wrongful discharge were likewise properly rested on the ground that such actions against defendant employees in their official capacity were barred by the doctrine of sovereign immunity. The trial court's dismissal of the claim against Dr. Baucom and Dr. Harman in their official capacity for tortious interference with contract was also correctly grounded on sovereign immunity. Accordingly, we affirm dismissal of these four claims.

In light of the foregoing discussion of plaintiff's claims, defendants' cross assignments of error premised on defendants' alternative motions are not well-founded and are overruled.

Affirmed in part; reversed in part and remanded.

Judges JOHNSON and ORR concur.