KENNETH A. BLOCH, Plaintiff-Appellee v. THE PAUL REVERE LIFE INSURANCE COMPANY, THE PAUL REVERE VARIABLE ANNUITY INSURANCE COMPANY, THE PAUL REVERE PROTECTIVE LIFE INSURANCE COMPANY, KYLE S. MERCER and BRIDGET COSTNER, Defendants-Appellants

No. COA00-97

(Filed 1 May 2001)

### 1. Employer and Employee— termination of at-will employee—damages

The trial court erred by denying a motion for judgment notwithstanding the verdict by defendants-Paul Revere in an action arising from the termination of an at-will employee on the ground that the employee could not recover damages past his termination date. Although the jury returned damages for 15 years of lost earnings, either plaintiff or defendant could terminate the employment contract for any reason with thirty days' notice and plaintiff had no contractual right or reasonable expectation of 15 years continued employment.

### 2. Wrongful Interference— tortious interference with employment contract—co-employees—sufficiency of evidence

The trial court did not err by denying motions for a directed verdict, judgment notwithstanding the verdict, or a new trial by defendants Mercer and Costner on a tortious interference with contract claim where there was sufficient evidence to show that these two defendants, co-employees with plaintiff, were not motivated in their actions by reasonable good faith attempts to protect their interests or the corporation's interests, and that they exceeded their legal right or authority in order to prevent the continuation of the contract between plaintiff and defendants-Paul Revere.

BLOCH v. PAUL REVERE LIFE INS. CO.

[143 N.C. App. 228 (2001)]

Appeal by defendants from judgment entered 11 June 1999 by Judge W. Robert Bell in Mecklenburg County Superior Court. Heard in the Court of Appeals 15 February 2001.

*Wilson & Bos, by Gerard A. Bos, for plaintiff-appellee.*

*Robinson, Bradshaw & Hinson, P.A., by Charles E. Johnson; Paul, Hastings, Janofsky & Walker, LLP, by Eric T. Levine and Patrick W. Shea, for defendants-appellants.*

TYSON, Judge.

Defendants: The Paul Revere Life Insurance Company, The Paul Revere Variable Annuity Insurance Company, and The Paul Revere Protective Life Insurance Company (collectively, "Paul Revere") and individual defendants Kyle S. Mercer ("Mercer") and Bridget Costner ("Costner"), appeal the trial court's entry of judgment in favor of plaintiff Kenneth A. Bloch ("Bloch"). We reverse in part and affirm in part the trial court's entry of judgment as to Paul Revere, and affirm the trial court's entry of judgment as to Mercer and Costner.

## Facts

Bloch began working for Paul Revere as a Group Insurance Underwriter in 1972 in Chicago, Illinois. In 1979, Bloch was transferred to Charlotte, North Carolina to establish a disability insurance office for Paul Revere. On 1 November 1983, Bloch executed a General Management Agreement ("GMA") with Paul Revere to become a Brokerage General Manager in Paul Revere's Charlotte office. The GMA detailed Bloch's responsibilities as General Manager and Paul Revere's responsibilities of support and assistance for Bloch's office operations. The GMA provided: (1) "Paul Revere reserves the right to restrict [Bloch's] authority at any time with respect to . . . the management of the office" and (2) "[t]his Agreement may be terminated by either party giving the other thirty days' written notice."

Mercer was also transferred by Paul Revere to Charlotte in 1983. In 1984, Mercer became a General Manager for Paul Revere's Group Sales in Charlotte. Although Bloch and Mercer worked in different divisions of Paul Revere, Brokerage and Group, the two were required to work together to sell certain policies. Bloch and Mercer exercised differing management styles, and friction developed between the two.

Costner began employment with Paul Revere in 1984 as an office manager, supervising the daily functions of Bloch's Brokerage office. Bloch promoted Costner to Brokerage Representative in 1986. Bloch considered Costner for a promotion to Sales Manager in 1991. In a confidential annual evaluation for management review, Bloch stated that Costner was a candidate for the Sales Manager position. However, Bloch expressed concern that Costner was a single mother with two children, and that she "no longer has any support mechanism at home." Costner was not promoted in 1991.

In 1992, Mary Rachal, Sales Vice-President, provided Costner with a set of criteria to achieve in order for her to be promoted to Sales Manager in Bloch's office by 1993. Bloch urged Costner to meet the criteria and work for the promotion.

In July 1993, Mercer was promoted by Paul Revere to Regional Managing Director. Bloch remained in his position as General Manager. Bloch requested Paul Revere's senior management to reconsider Mercer's promotion, without success. Mercer was promoted. Bloch was required to report to Mercer.

Costner and Mercer had become friendly during the time they worked together at Paul Revere. Donald Tardif ("Tardif"), a sales representative in Mercer's Charlotte office and Mercer's personal friend, testified that Mercer and Costner had confided in him that their relationship had developed into a sexual relationship. Susan Potter ("Potter"), who became Bloch's Office Manager in 1991, corroborated that Costner had admitted to having a sexual relationship with Mercer.

Tardif also testified that Mercer and Costner often talked about Bloch, "how poor of a manager he was, how much they disliked him, they didn't trust him, he was an idiot." Tardif further testified that, based on "just hundreds of conversations," it was apparent that Mercer "was interested in having Mr. Bloch removed from Paul Revere." Potter testified that Bloch was "one of the best managers [she] ever had."

Following Mercer's promotion, and with his assistance, Costner filed a formal internal discrimination complaint against Bloch. Costner alleged that Bloch unfairly discriminated against her by failing to promote her to Sales Manager in 1991. Specifically, Costner cited as unfair Bloch's comments that he was concerned about her single-mother status at home.

BLOCH v. PAUL REVERE LIFE INS. CO.

[143 N.C. App. 228 (2001)]

Bloch testified that his comments were made in a confidential review for management, and that he did not know how Costner obtained the document. A copy of the review with Costner's hand-written notes was introduced into evidence. Bloch testified it was "highly unusual" for a sales representative to have a copy of their own evaluation, and that he was "flabbergasted" when he saw Costner's handwritten notes on the evaluation.

Paul Revere investigated Costner's complaint. Patrick Morris ("Morris"), Sales Vice-President, interviewed Costner, Mercer and Bloch. Costner alleged that Bloch reneged on a promise to promote her. Bloch denied promising Costner the promotion. Bloch testified that he asked to see any documentation that had been developed regarding the complaint, but that Paul Revere management "refused to give it to [him]." Bloch acknowledged that his GMA gave Paul Revere senior management the final authority to determine office operations, including promotions.

Over Bloch's written protest, Morris promoted Costner to the Sales Manager position in Bloch's office in December 1993. Morris further ordered Bloch to pay Costner back pay and manager commissions from November 1991 through November 1993. Bloch made the required payments.

Costner admitted at trial that she had not met all of the sales criteria that had been given to her by Mary Rachal prior to her promotion. Tardif testified that just prior to her promotion, Mercer confided in him that "he was concerned" about Costner because she "was not doing her job." Tardif testified that Mercer admitted to him that Costner "was not achieving her numbers." Mercer told Tardif that "because of their friendship he was fighting hard for her." Bloch also testified that Mercer had expressed to him that Costner was not qualified for the promotion, but that Mercer supported her claim that she was entitled to the promotion nonetheless.

Potter testified that she later discovered Costner had told Paul Revere senior management that Potter had corroborated her claim that Bloch promised Costner the promotion. Potter drafted a letter to Barry Lundquist ("Lundquist"), Senior Sales Vice-President, to state that she "absolutely did not" corroborate Costner's claim, and that she never heard Bloch promise Costner the promotion. Potter testified that she was upset that no one had "even bothered to look into it or ask me or have anyone else ask me." Potter further stated that she

expressed to Lundquist that she felt "that there were still things going on in the office that [he] needed to know about."

Relations between Bloch, Mercer, and Costner continued to deteriorate. Bloch testified that after Mercer became a regional director, Mercer began to "circumvent [his] general managership." Bloch testified that Mercer began sending documents and "pertinent information on the running of the brokerage operation" directly to Costner. Bloch complained to Morris, who stated that he would have Mercer rectify the situation. Bloch testified that the situation did not change, and that Mercer continued to channel information "that should be coming to the manager . . . directly to Bridget Costner and not to me at all."

Bloch stated that the documents Mercer channeled to Costner "did in fact affect the performance of the operation and other representatives." Bloch testified that Mercer sent Costner, and not Bloch, the training manuals for two large Paul Revere accounts. The manuals contained pertinent information on how to operate the accounts. Tardif testified that while he worked in Mercer's Charlotte office, he witnessed and participated in conversations with Mercer and Costner wherein Costner would provide Mercer with information about Bloch's office and operation, even though Costner reported to Bloch.

Bloch testified that he "redefined [Paul Revere's] override system that [employees] could give commissions to brokers. Ms. Costner was aware of that." Bloch further testified that Costner interfered in a broker relationship without his knowledge. Costner completed documentation raising a broker's commission from 50% to 70%. This documentation required Bloch's signature as General Manager. However, the documents were signed by Mercer and delivered directly to the Paul Revere home office without Bloch's knowledge. Bloch learned of the higher commissions from the home office, and requested that the documents be sent back to Charlotte for his review.

Bloch stated that overall, Costner and Mercer were "undermining my authority at every turn. [Costner] was running into [Mercer's] office all the time, [Mercer] was running into [Costner's] office all the time. I had learned that [Costner] had made comments that I could not be trusted, and do not talk with [me], those types of things." Bloch testified that Mercer's and Costner's actions had a negative impact on his operations. Frances Hendricks ("Hendricks"), Costner's assistant, complained to Bloch that "she was unhappy having to cover

up for [Costner]" and that she was "intimidated to go directly to [Mercer]."

Tardif testified that in 1994, Mercer discussed with both Tardif and Morris his desire to remove Bloch from the Charlotte office. They discussed a proposal for a new distribution system at Paul Revere in North Carolina which would eliminate the distinction between the Brokerage and Group divisions. The new distribution system eliminated the need for Bloch's General Manager position. Tardif testified that Mercer and Costner expressed to him that one of the reasons to implement the new plan was to force Bloch out.

Bloch testified that Mercer developed a new marketing initiative program in 1995. Bloch stated that Mercer did not inform him of the new program, thereby preventing Bloch's sales representatives from benefitting from the new program. Again in 1995, Mercer introduced a new sales program in the Carolinas. Bloch testified that the program information went directly to Costner and not to Bloch, thereby "prevent[ing] all my other reps [other than Costner] from selling that concept." Bloch testified that the new concepts and initiatives were introduced to his sales team, only after his removal as General Manager.

In 1995, Bloch discovered Costner's handwritten notes in her office, wherein Bloch's removal from the Charlotte office was contemplated. The notes expressed a need for better leadership, and stated that Bloch had caused "low productivity, continuous staff problems, low morale, lack of vision, growth and unity." Costner also had written that Bloch had continuously failed to meet goals, and that "he is distrusted by sales and staff alike." Costner's notes concluded that Mercer should be made head of all operations in Charlotte.

Bloch interpreted the notes as originating from a meeting of which Bloch was not aware and had not attended. Costner testified that the notes were a "homework" assignment, wherein she was asked to design her own ideal office structure as though she had "a magic wand." Bloch reported the notes to Morris and Lundquist. Bloch informed them that Mercer and Costner were conspiring against him and interfering with his ability to perform his job. Bloch testified that he had never received an unfavorable performance review during his employment at Paul Revere.

While Lundquist investigated the contents of Costner's memorandum, Costner filed another complaint against Bloch. Costner based

the complaint on the manner in which Bloch had handled Hendrick's complaint of being unhappy working for Costner, and of being intimidated by Mercer. Bloch testified that Costner was upset because "[Costner] felt that she could control the situation, that no one had to be involved in it." Mercer accused Bloch of lying about the details surrounding Hendricks' complaint.

Mercer prepared a memorandum to Lundquist and Morris on 20 September 1995. The memorandum contained "a written summary of [Mercer's] notes with the employees who are involved in a recent situation involving [Bloch] and the Charlotte Brokerage office." Mercer's memorandum indicated that he interviewed Tanya Green ("Green"), a sales assistant in Bloch's office, on 11 September 1995. Mercer's memorandum also indicated that Green had told Mercer that Bloch did not provide "backup or support" for employees. Mercer's memorandum indicated that Green stated that Costner "cares about the staff and how we feel and our happiness. . . ." Green testified that Mercer never conducted any such interview.

As a result of the memorandum and Costner's complaint, Paul Revere investigated Bloch. Morris spent time at the Charlotte office evaluating Bloch in November 1995. Bloch testified that Morris also met with Costner. Bloch told Morris the various problems he had encountered with Mercer and Costner. Morris' evaluation report did not address Bloch's concerns. Morris' report detailed Bloch's weaknesses, the "biggest concern" of which was Bloch's "leadership abilities going forward." Morris' report concluded that Bloch's lack of improvement would be "grounds for removal from [his] management position."

Green testified that Morris called her on 14 November 1995. Morris' summary of the interview with Green indicated that Green had expressed that Bloch was not a good manager, that he did not help employees, that he encouraged only certain employees, but not Costner, and that Bloch always took 100% of the credit, without recognizing staff for their work. Green testified that she did not make any such statements to Morris, and that she did not know where Morris had gotten this information.

In November 1995, in the same month Morris evaluated Bloch's performance, Bloch received a letter from Lundquist congratulating Bloch on his outstanding performance:

> You are to be especially commended for your efforts and that of your associates for exceeding your contest goal during our just

concluded centennial sales campaign. I know this in a large part has to do with the leadership you provide through your hard work, dedication, and the fact that you truly care about our company and your associates.

Bloch testified that Morris' appraisal report did not reference Bloch's high performance addressed in Lundquist's letter.

Morris instructed Bloch to meet with Mercer to discuss ways in which Bloch could improve his performance. Bloch met with Mercer at Morris' direction, also in November 1995. Bloch told Mercer that he believed that the two could work well together. Bloch testified that Mercer responded that he did not agree, and that he did not think Bloch would ever change. Mercer told Bloch that he "was fired," and to expect a package in December explaining Bloch's future role at Paul Revere. Bloch reported the incident to Morris. Morris directed Bloch to meet again with Mercer.

At Morris' direction, Bloch met with Mercer the following day. Bloch testified that he told Mercer, "let's get through these [trust factors] and let's work together for the future." Mercer responded to Bloch, "I don't like you, I don't respect you, I don't trust you . . . you're fired effective December 1, 1995." Bloch again reported the meeting to Morris, who told Bloch that he was not fired. Nonetheless, in late December 1995, Morris notified Bloch that Paul Revere was terminating his GMA. The contract ended 31 January 1996.

On 23 April 1996, Bloch filed this action against Paul Revere, Mercer, and Costner. Bloch alleged: (1) breach of contract; (2) tortious interference with contract; (3) intentional infliction of emotional distress; and (4) libel and slander. All defendants filed motions to dismiss, or in the alternative, for partial summary judgment on 24 June 1996. On 13 August 1996, the trial court granted partial summary judgment for defendants on Bloch's claim for breach of contract arising out of the termination of the GMA. The trial court dismissed Bloch's claim for tortious interference with contract against Paul Revere, as well as Bloch's claim for intentional infliction of emotional distress as to all defendants.

The trial court deferred judgment pending discovery on Bloch's breach of contract claim arising out of alleged breaches prior to termination of the GMA, claims for tortious interference with contract against Mercer and Costner, and Bloch's claim for libel and slander

against all defendants. On 8 May 1997, the trial court allowed defendants to file an Amended Answer with counterclaims against Bloch for breach of the GMA, breach of a fiduciary duty, and breach of a confidentiality agreement.

On 18 September 1997, the trial court denied defendants' renewed motion for summary judgment on Bloch's remaining claims. Bloch's claims were tried before a jury during April 1999. All defendants moved for a directed verdict following the close of Bloch's evidence. The trial court granted the motion as to Bloch's libel and slander claims, but denied the motion as to all other claims.

The jury returned a verdict in favor of Bloch in the amount of $1,079,000.00 for breach of contract. The jury specifically divided the breach of contract award, finding that the amount of damages Bloch suffered prior to the 31 January 1996 termination of the GMA was $15,000.00. The jury also found that Bloch sustained damages of $1,064,000.00 after termination of the GMA.

The jury also awarded Bloch $75,000.00 in compensatory damages and $100,000.00 in punitive damages against Mercer for tortious interference with contract. The jury further awarded Bloch $15,000.00 in compensatory damages and $5,000.00 in punitive damages against Costner for tortious interference with contract. The jury found that Bloch had breached the GMA, the confidentiality agreement, and a fiduciary duty. The jury awarded Paul Revere a total of $5,000.00.

On 3 May 1999, all defendants moved for judgment notwithstanding the verdict, or new trial. The trial court denied the motions on 4 June 1999. The trial court entered judgment on the jury's award on 11 June 1999, and additionally ordered that all defendants pay Bloch a total of $19,105.25 in costs, and that Bloch pay Paul Revere $822.00 in costs. Defendants appeal.

## Issues

Paul Revere appeals the trial court's denial of its motions for directed verdict, judgment notwithstanding the verdict, or new trial, contending that Bloch is an at-will employee, and cannot recover damages beyond the 31 January 1996 termination of the GMA. Mercer and Costner appeal the trial court's denial of their motions for directed verdict, judgment notwithstanding the verdict, or new trial, on grounds that Bloch failed to produce evidence sufficient to sustain claims of tortious interference with contract.

We reverse the trial court's entry of judgment for $1,064,000.00 for Paul Revere's breach of contract post-termination. We remand for entry of judgment against Paul Revere for $15,000.00, plus costs and interest, consistent with the jury's finding of damages sustained by Bloch prior to termination of the GMA. We affirm the trial court's entry of judgment as to Mercer and Costner.

## I. Breach of Contract

[1] Paul Revere assigns error to the trial court's denial of its motions for directed verdict, judgment notwithstanding the verdict, or new trial, on grounds that Bloch, an at-will employee, cannot recover damages past the 31 January 1996 termination of the GMA. We agree.

Our standard of review on a motion for directed verdict and judgment notwithstanding the verdict is whether, "upon examination of all the evidence in the light most favorable to the nonmoving party, and that party being given the benefit of every reasonable inference drawn therefrom, the evidence is sufficient to be submitted to the jury." *Fulk v. Piedmont Music Center*, 138 N.C. App. 425, 429, 531 S.E.2d 476, 479 (2000) (citing *Abels v. Renfro Corp.*, 335 N.C. 209, 214-15, 436 S.E.2d 822, 825 (1993)).

Here, the jury returned a verdict in favor of Bloch for $1,079,000.00 for breach of Bloch's GMA. The jury specifically divided the award, indicating that Bloch was entitled to $15,000.00 for Paul Revere's breach of the GMA prior to its 31 January 1996 termination. The jury awarded $1,064,000.00, equal to 15 years of Bloch's lost earnings, following his termination. Paul Revere does not assign error to the trial court's entry of judgment in favor of Bloch for $15,000.00 prior to termination of the GMA.

It is a well-established principle of contract law that:

'A party to a contract who is injured by another's breach of the contract is entitled to recover from the latter damages for all injuries and only such injuries as are the direct, natural, and proximate result of the breach or which, in the ordinary course of events, would likely result from a breach and can reasonably be said to have been foreseen, contemplated, or expected by the parties at the time when they made the contract as a probable or natural result of a breach.'

*Lamm v. Shingleton*, 231 N.C. 10, 14, 55 S.E.2d 810, 812-13 (1949) (quoting 15 A.J. 449, § 51; 25 C.J.S. Damages, § 24, page 481). "The

interest being protected by this general rule is the non-breaching party's 'expectation interest.' " *First Union Nat'l Bank of North Carolina v. Naylor*, 102 N.C. App. 719, 725, 404 S.E.2d 161, 164 (1991) (quoting Restatement (Second) of Contracts § 344(a) comment a (1979)).

Our Supreme Court has specifically held that the measure of damages recoverable for breach of an employment contract is "the actual loss or damage sustained on account of the breach. The maximum amount recoverable would be the difference, if any, between the agreed compensation and the amount plaintiff earned or by reasonable effort could earn <u>during the contract period</u>." *Thomas v. Catawba College*, 248 N.C. 609, 615, 104 S.E.2d 175, 179 (1958) (citations omitted) (emphasis supplied); *see also*, *Lowery v. Love*, 93 N.C. App. 568, 571, 378 S.E.2d 815, 817 (1989).

It is also well-settled "that 'in the absence of an employment contract for a definite period, both employer and employee are generally free to terminate their association at any time and without any reason.' " *McMurry v. Cochrane Furniture Co.*, 109 N.C. App. 52, 54, 425 S.E.2d 735, 737 (1993) (quoting *Salt v. Applied Analytical*, Inc., 104 N.C. App. 652, 655, 412 S.E.2d 97, 99 (1991), *disc. review denied*, 331 N.C. 119, 415 S.E.2d 200 (1992)).

We apply these basic contract principles here. Bloch maintained that Paul Revere's breach of its obligations under the GMA interfered with Bloch's ability to perform the GMA. As a result, Bloch sustained an actual loss of the GMA. Bloch's damages for Paul Revere's breach of the GMA are coequal with his entitlement under the GMA. Bloch was entitled to recover the damages he sustained only while the GMA was effective. The jury determined this amount to be $15,000.00. Bloch, a contractual employee for an indefinite term, was not contractually or legally entitled to continued employment with Paul Revere under the GMA beyond 30 days. Paul Revere or Bloch could terminate the GMA for any reason with 30 days notice. Thus, Bloch is not entitled to recover damages beyond the lawful termination of the GMA. *See Bennett v. Eastern Rebuilders, Inc.*, 52 N.C. App. 579, 583, 279 S.E.2d 46, 49 (1981) (contract damages for at-will employee are coextensive with entitlement).

The jury's award of $1,064,000.00, equal to 15 years of lost earnings following termination of the GMA, is contrary to basic contract principles. Bloch had no contractual right or reasonable expectation to 15 years of continued employment under the GMA. The trial court

erred in failing to grant Paul Revere's motion for judgment notwithstanding the verdict on breach of contract post-termination of the GMA.

## II. Tortious Interference with Contract

[2] Mercer and Costner assign error to the trial court's denial of their motions for directed verdict and judgment notwithstanding the verdict, or new trial, on grounds that Bloch did not present evidence sufficient to sustain claims of tortious interference with contract against them. We disagree.

The elements of tortious interference with contract are:

(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff.

*Embree Construction Group, Inc. v. Rafcor, Inc.*, 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992) (citing *United Laboratories, Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988)). A plaintiff may maintain a claim for tortious interference with contract even if the employment contract is terminable at will. *Lenzer v. Flaherty*, 106 N.C. App. 496, 512, 418 S.E.2d 276, 286, *disc. review denied*, 332 N.C. 345, 421 S.E.2d 348 (1992) (citing *Smith v. Ford Motor Co.*, 289 N.C. 71, 85, 221 S.E.2d 282, 290 (1976)).

A party who induces one party " 'to terminate or fail to renew a contract with another may be held liable for malicious interference with the party's contractual rights if the third party acts without justification.' " *Robinson, Bradshaw & Hinson, P.A. v. Smith*, 129 N.C. App. 305, 317, 498 S.E.2d 841, 850, *disc. review denied*, 348 N.C. 695, 511 S.E.2d 649 (1998) (quoting *Fitzgerald v. Wolf*, 40 N.C. App. 197, 199, 252 S.E.2d 523, 524 (1979)). Bad motive is the essence of a claim for tortious interference with contract. *Id.* at 318, 498 S.E.2d at 851 (citation omitted).

Whether a defendant is justified in interfering with a plaintiff's contract depends upon " 'the circumstances surrounding the interference, the actor's motive or conduct, the interests sought to be advanced, the social interest in protecting the freedom of action of the actor[,] and the contractual interests of the other party.' " *Robinson, Bradshaw & Hinson, P.A.* at 317-18, 498 S.E.2d at

850 (quoting *Peoples Security Life Ins. Co. v. Hooks*, 322 N.C. 216, 221, 367 S.E.2d 647, 650, *reh'g denied*, 322 N.C. 486, 370 S.E.2d 227 (1988)). A defendant may be justified in interfering with a contract if he does so " 'for a reason reasonably related to a legitimate business interest.' " *Id.* at 318, 498 S.E.2d at 850 (quoting *Fitzgerald*, 40 N.C. App. at 200, 252 S.E.2d at 524); *see also, Barnard v. Rowland*, 132 N.C. App. 416, 426, 512 S.E.2d 458, 465-66 (1999).

As a general rule, " 'non-outsiders' [to the contract] often enjoy qualified immunity from liability for inducing their corporation or other entity to breach its contract with an employee." *Lenzer* at 513, 418 S.E.2d at 286 (citing *Smith* at 85, 221 S.E.2d at 290). However, "[t]he qualified privilege of a non-outsider is lost if exercised for motives other than reasonable, good faith attempts to protect the non-outsider's interests in the contract interfered with." *Id.* (quoting *Smith* at 91, 221 S.E.2d at 294).

In order to hold a "non-outsider" liable for tortious interference with contract, a plaintiff must establish that the defendant acted with legal malice, that " 'he does a wrongful act or exceeds his legal right or authority in order to prevent the continuation of the contract between the parties.' " *Robinson, Bradshaw & Hinson, P.A.*, at 318, 498 S.E.2d at 851 (quoting *Varner v. Bryan*, 113 N.C. App. 697, 702, 440 S.E.2d 295, 298 (1994)). "The plaintiff's evidence must show that the defendant acted without any legal justification for his action." *Varner* at 702, 440 S.E.2d at 298 (citation omitted).

Mercer and Costner argue that, as employees of Paul Revere, they were "non-outsiders" to Bloch's GMA, and are insulated from liability. They also argue that Bloch did not present sufficient evidence to establish that they acted outside the scope of their employment and without a legitimate business interest, consequently establishing that they acted without legal justification.

In *Lenzer*, *supra*, we held that the plaintiff forecast sufficient evidence to overcome the defendants' "non-outsider" privilege. *Lenzer*, 106 N.C. App. at 512-13, 418 S.E.2d at 286. The defendants argued that they were immune from liability because "their supervisory status dictates they were not outsiders to plaintiff's employment contract." *Id.* The plaintiff alleged that the defendants, her supervisors, purposefully withdrew their supervision from her "for the purpose of causing her to lose the certification required for plaintiff to maintain her position with the State." *Id.* at 512, 418 S.E.2d at 286. She alleged "that defendants were motivated by unlawful reasons rather than

legitimate business interests; and that withdrawal of supervision in fact caused the intended effect of plaintiff losing her employment, resulting in damage to plaintiff." *Id.*

We stated that even if the defendants "were deemed to have the status of non-outsiders, such status 'is pertinent only to the question [of the] justification for [defendants'] action.' " *Id.* at 513, 418 S.E.2d at 286 (quoting *Smith,* 289 N.C. at 88, 221 S.E.2d at 292). In reversing summary judgment for the defendants, we noted that the plaintiff's "forecast of evidence raises precisely the issue of wrongful purpose, which would defeat a non-outsider's qualified privilege to interfere." *Id.*

This Court recently reiterated the principles set forth in *Lenzer. See Barker v. Kimberly-Clark Corp.,* 136 N.C. App. 455, 524 S.E.2d 821 (2000). We again held that "non-outsider" status does not insulate a defendant from liability where the defendant acts without a reasonable, good-faith motive. *Id.* at 463, 524 S.E.2d at 826.

The plaintiff in *Barker* alleged that her former managers, the defendants, "out of personal hostility and ill-will toward the Plaintiff, schemed to come up with false and defamatory accusations against the Plaintiff with the intent to bring about the termination of her employment." *Id.* at 463, 524 S.E.2d at 826-27. The plaintiff further alleged that the defendants had a "hit list" of employees they wanted "to get rid of," and that her name was on the list. *Id.* at 463, 524 S.E.2d at 827. The plaintiff contended that when she confronted one of the defendants about the "hit list," he admitted his desire to terminate her employment. *Id.* We reversed the trial court's entry of summary judgment for the defendants, and held that the plaintiff's forecast of evidence was sufficient to raise an issue of whether the defendants' motives "were reasonable, good faith attempts to protect their interests or the corporation's interests." *Id.*

In the present case, Tardif testified that Mercer and Costner constantly discussed their desire to have Bloch terminated. Tardif also testified that Mercer was receiving improper and illegal commissions through a Paul Revere shell entity known as Tax Advantage Planning Company ("TAPCO"), which consisted only of a bank account. Tardif testified that, aside from Mercer's desire to be in control of all North Carolina operations, Mercer wanted Bloch terminated, in part, due to "the fact that [Bloch] was aware of TAPCO." One month prior to his termination, Bloch made known to Paul Revere that he had a "file of evidence" against Mercer.

Tardif testified that Costner, who reported to Bloch, provided Mercer with the details of Bloch's operations. Bloch also testified that Mercer and Costner shared information pertinent to Bloch's office operations without Bloch's knowledge. The evidence established that Mercer channeled information intended for Bloch, the General Manager, directly to Costner, without Bloch's knowledge on several occasions. This information, including the operating manuals for two large Paul Revere accounts, was pertinent to Bloch's ability to successfully operate his office.

The evidence further established that Costner channeled information intended for Bloch, the General Manager, directly to Mercer, without Bloch's knowledge. This information, including increases in broker commissions, was pertinent to Bloch's success as General Manager. Bloch also forecast evidence that Mercer purposefully failed to disclose new sales initiatives and programs to Bloch and his sales representatives, other than Costner. The evidence established that such information was pertinent to the success of Bloch's office in relation to other Paul Revere offices. This and other testimony tended to show that Mercer's and Costner's actions to undermine Bloch as General Manager negatively impacted Bloch's performance and the operations in his area of responsibility.

Evidence also established that Mercer and Costner told Paul Revere senior management, as well as Paul Revere employees working in Bloch's office, that Bloch was a poor manager, that he could not be trusted, and that employees should not confide in or speak with Bloch. Hendricks, Costner's assistant, testified that she was unhappy having to "cover up" for Costner, and that she was intimidated by Mercer. Green testified that she never met with Mercer in September 1995, despite Mercer's memorandum to Lundquist and Morris indicating that he had interviewed Green, and that she had complained about Bloch's management skills. Green also testified that she never made the negative statements about Bloch that appeared in Morris' November 1995 notes from an interview with Green.

The evidence must be viewed in the light most favorable to Bloch, giving him the benefit of every reasonable inference to be drawn therefrom. *See Fulk*, 138 N.C. App. at 429, 531 S.E.2d at 479. We hold that Bloch presented sufficient evidence to show that Mercer and Costner were not motivated by "reasonable, good faith attempts to protect their interests or the corporation's interests," and that they exceeded their legal right or authority in order to prevent the contin-

uation of the contract between Bloch and Paul Revere. *See Barker* at 463, 524 S.E.2d at 827; *Robinson, Bradshaw & Hinson, P.A.*, at 318, 498 S.E.2d at 851.

We distinguish *Varner, supra,* on which Mercer and Costner rely. The plaintiff in *Varner* was the former town manager of Knightdale, North Carolina. *Varner,* 113 N.C. App. at 698, 440 S.E.2d at 296. The plaintiff brought suit for tortious interference with contract against three town council members who sought his resignation:

> Plaintiff's evidence tended to show that defendants' dissatisfaction with his performance was personal in nature, having to do with plaintiff's opinion that defendants Bullock and Bryan were violating certain town ordinances in connection with their businesses, or was politically motivated; defendants' evidence tended to show that they considered plaintiff's job performance to be inadequate. . . . [D]efendants informed plaintiff that they considered plaintiff's job performance to be inadequate and requested his resignation.

*Id.* at 699, 440 S.E.2d at 297.

In upholding the trial court's grant of summary judgment for the defendants, we held that the plaintiff failed to present evidence establishing that the defendants, as non-outsiders, acted with legal malice. *Id.* at 702, 440 S.E.2d at 299. We noted that the plaintiff, as town manager, served at the pleasure of the town council, and that the defendants, as town council members, had authority to discharge the plaintiff. *Id.* We stated that, "[e]ven if plaintiff was terminated by defendants for personal or political reasons, as his evidence tends to show, such termination was neither a wrongful act nor one in excess of defendants' authority and therefore not legally malicious." *Id.*

In this case, as compared to *Varner,* Bloch forecast evidence beyond Mercer's and Costner's personal or political motivation. The plaintiff's evidence in *Varner* did not establish that the defendants actively undermined the plaintiff's authority in a manner that interfered with the plaintiff's abilities as town manager. Nor did the evidence in *Varner* reveal that the defendants actively spread false and defamatory information about the plaintiff in an effort to turn other council members against him. The evidence merely showed that the defendants sought to terminate the plaintiff for personal reasons.

The present case is more analogous to *Lenzer* and *Barker,* where the evidence tended to show that the non-outsider defendants

actively schemed against the plaintiff, falsely accused the plaintiff, or purposely failed to supervise and work with the plaintiff in an effort to bring about termination.

We hold that Bloch presented sufficient evidence that Mercer and Costner interfered with his employment contract without legal justification to do so. The jury was entitled to consider these issues and render its verdict thereon. The trial court did not err in denying Mercer's and Costner's motions.

We hereby reverse the trial court's denial of Paul Revere's motion for judgment notwithstanding the jury's verdict of $1,079,000.00 for breach of the GMA. We remand for entry of judgment against Paul Revere in the amount of $15,000.00, with costs and interest awarded, consistent with the jury's finding of damages sustained by Bloch prior to the 31 January 1996 termination of the GMA. We affirm the trial court's entry of judgment for compensatory and punitive damages and costs against Mercer and Costner.

Affirmed in part, reversed and remanded in part.

Judges MARTIN and TIMMONS-GOODSON concur.