DIXIE L. DEERMAN, PLAINTIFF v. BEVERLY CALIFORNIA CORPORATION, A
CALIFORNIA CORPORATION, D/B/A/ BRENTWOOD HILLS NURSING CENTER, AND
NOW KNOWN AS BEVERLY HEALTH AND REHABILITATION SERVICES, INC., A
CALIFORNIA CORPORATION, DEFENDANT

No. COA98-135-2

(Filed 21 September 1999)

**Employer and Employee— wrongful discharge from employ-
ment—against public policy—motion to dismiss improp-
erly granted**

Taking the allegations of plaintiff-nurse's complaint alleging
wrongful discharge from employment by defendant based on her
advising a patient's family who solicited her opinion that they
should consider changing physicians as true, the trial court erred
in granting defendant's Rule 12(b)(6) motion to dismiss because
plaintiff's termination was motivated by a reason or purpose that
is against public policy since the statements which led to her ter-
mination were proffered in fulfillment of her "teaching and coun-
seling" obligations as a licensed nurse. N.C.G.S. § 90-171.20(7).

Appeal by plaintiff from order filed 30 October 1997 by Judge
Robert D. Lewis in Buncombe County Superior Court. Heard in the
Court of Appeals 18 March 1999.

*George W. Moore for plaintiff-appellant.*

*Moore & Van Allen, P.L.L.C., by Randel E. Phillips and
Meredith W. Holler, for defendant-appellee.*

1

**DEERMAN v. BEVERLY CALIFORNIA CORP.**

[135 N.C. App. 1 (1999)]

JOHN, Judge.

Plaintiff appeals the trial court's dismissal pursuant to N.C.G.S. § 1A-1, Rule 12(b)(6) (1990) (Rule 12(b)(6)) of her complaint alleging wrongful discharge from employment by defendant. Upon careful review, we reverse.

Pertinent factual allegations contained in plaintiff's complaint, filed 11 July 1997, included the following:

2. The Plaintiff is and was at all relevant times herein a registered nurse licensed by the State of North Carolina.

3. The Plaintiff was hired by the Defendant as a registered nurse at its Brentwood Hills Nursing Center in Buncombe County, North Carolina on June 25, 1994; the Plaintiff was promoted to the job of Care Plan Coordinator in January, 1995.

4. The Plaintiff was responsible for managing medical care and treatment for all patients at the Defendant's facility . . . .

5. Prior to July, 1995, the Plaintiff had never been advised by administrative or supervisory personnel at the Brentwood Hills Nursing Center that her performance was in any way inadequate or incompetent and she was given a promotion shortly before July, 1995.

6. In July, 1995, the Plaintiff's salary was based on an hourly wage of $16.50 per hour and she averaged approximately 45 hours each week.

7. In and prior to July of 1995, the Plaintiff was providing nursing services to a patient at the Brentwood Hills Nursing Center; this patient began losing weight, having hallucinations, psychiatric symptoms and acute distress; the Plaintiff documented and reported all of the patient's medical difficulties to the patient's physician; the Plaintiff also attempted to contact the patient's physician by telephone, but the physician would not return her telephone calls; the Plaintiff observed that the patient's condition was deteriorating and that she was in need of a change of treatment.

8. The Plaintiff was contacted by a member of the patient's family regarding the patient's difficulties and deteriorating condition; after the Plaintiff advised the patient's family as to her concerns, one of the family members asked for the Plaintiff's

advice as to what should be done for the patient and the Plaintiff advised that she would reconsider the choice of physicians in that the appropriate treatment had not been provided for her by her physician.

9. The Defendant, after being advised that the Plaintiff had advised the patient's family that she would reconsider the choice of physicians for the patient, terminated the Plaintiff from her position of employment with the Defendant; the Defendant's agents advised the Plaintiff that her termination was due to her advising the family of the patient that they should consider changing physicians for the patient.

10. The Plaintiff at all times performed her duties responsibly and competently while she was employed as a registered nurse for the Defendant.

11. After her discharge, the Plaintiff attempted to find work as a registered nurse at other facilities in the area with no success.

12. As a result of her discharge, the Plaintiff has lost substantial amounts of income and fringe benefits, including, but not limited to, medical insurance, vacation pay, and retirement benefits . . . .

Plaintiff further alleged that in advising the patient's family concerning choice of physicians, she had complied with the North Carolina General Statutes and the North Carolina Administrative Code regulating the practice of nursing. Therefore, plaintiff continued, termination of her employment by defendant was

in violation of the strong public policy favoring administering of nursing services to those acutely or chronically ill and the supervising by nurses of patients during convalescence and rehabilitation.

On 15 August 1997, defendant moved to dismiss plaintiff's complaint under Rule 12(b)(6) for failure to state a claim upon which relief might be granted. In particular, defendant asserted that

[p]laintiff was terminated for vocalizing to a patient's family member her criticisms of the treatment provided to the patient by the attending physician, and recommending to the patient's family member that the family select a different physician. The Defendants' justification and motive as alleged in [plaintiff's complaint] does not violate any public policy of North Carolina . . . .

The trial court granted defendant's motion 30 October 1997, and plaintiff timely appealed.

In reviewing the grant of a Rule 12(b)(6) motion, we must consider whether plaintiff was entitled to relief "under any state of facts which could be presented in support of the claim." *Barnaby v. Boardman*, 70 N.C. App. 299, 302, 318 S.E.2d 907, 909 (1984), *rev'd on other grounds*, 313 N.C. 565, 330 S.E.2d 600 (1985). Further, the complaint must be liberally construed, *Dixon v. Stuart*, 85 N.C. App. 338, 340, 354 S.E.2d 757, 758 (1987), and all well-pleaded allegations therein taken as true, *Sutton v. Duke*, 277 N.C. 94, 98, 176 S.E.2d 161, 163 (1970). A Rule 12(b)(6) motion should be granted only if the pleading at issue "fails to allege a sufficient legal or factual basis for the claim, or reveals a fact which necessarily defeats the claim." *Wilmoth v. State Farm Mut. Auto Ins. Co.*, 127 N.C. App. 260, 261, 488 S.E.2d 628, 630, *disc. review denied*, 347 N.C. 410, 494 S.E.2d 601 (1997).

The parties herein do not contest plaintiff's employment status as an "at-will" employee.

[I]n the absence of a contractual agreement between an employer and an employee establishing a definite term of employment, the relationship is presumed to be terminable at the will of either party without regard to the quality of performance of either party.

*Kurtzman v. Applied Analytical Industries, Inc.*, 347 N.C. 329, 331, 493 S.E.2d 420, 422 (1997).

In general, an at-will employee in this state may not maintain a claim for wrongful discharge. *Sides v. Duke University*, 74 N.C. App. 331, 336, 328 S.E.2d 818, 823, *disc. review denied*, 314 N.C. 331, 333 S.E.2d 490 and *disc. review denied*, 314 N.C. 331, 335 S.E.2d 13 (1985), *overruled on other grounds*, *Kurtzman*, 347 N.C. at 333, 493 S.E.2d at 423. However, certain exceptions to this general rule have been recognized; therefore,

while there may be a right to terminate [at-will employment] for no reason, or for an arbitrary or irrational reason, there can be no right to terminate such [employment] for an unlawful reason or purpose that contravenes public policy.

*Sides*, 74 N.C. App. at 342, 328 S.E.2d at 826.

Although our courts have enunciated no "bright-line" test for determining if termination of an at-will employee violates public

policy, *see Teleflex Information Systems, Inc. v. Arnold*, 132 N.C. App. 689, 691, 513 S.E.2d 85, 87 (1999), public policy has been defined as

> the principle of law that holds no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good,

*Johnson v. Mayo Yarns, Inc.*, 126 N.C. App. 292, 296, 484 S.E.2d 840, 842-43, *disc. review denied*, 346 N.C. 547, 488 S.E.2d 802 (1997). Elaborating further, our Supreme Court has observed:

> [a]lthough the definition of "public policy" approved by this Court does not include a laundry list of what is or is not "injurious to the public or against the public good," at the very least public policy is violated when an employee is fired in contravention of express policy declarations contained in the North Carolina General Statutes.

*Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 353, 416 S.E.2d 166, 169 (1992) (footnote omitted).

Previous decisions of this State's appellate courts have recognized claims for wrongful termination based upon the public policy exception when an employee alleges termination based upon political affiliation, *see Vereen v. Holden*, 121 N.C. App. 779, 784, 468 S.E.2d 471, 474-75 (1996), refusal to violate the United States Department of Transportation's regulations restricting the driving time of truck drivers, *see Coman v. Thomas Manufacturing Co.*, 325 N.C. 172, 175-76, 381 S.E.2d 445, 447 (1989), refusal to testify untruthfully or incompletely in a court action, *see Sides*, 74 N.C. App. at 343, 328 S.E.2d at 826-27, testifying at an Employment Security Act proceeding, *see Williams v. Hillhaven Corp.*, 91 N.C. App. 35, 41, 370 S.E.2d 423, 426 (1988), or refusal to cash a delinquent borrower's certificate of deposit without the notice to the debtor required by the Uniform Commercial Code, *see Roberts v. First-Citizens Bank and Trust Co.*, 124 N.C. App. 713, 721-22, 478 S.E.2d 809, 814-15 (1996). Nonetheless, any exception to the at-will employment doctrine "should be adopted only with substantial justification grounded in compelling considerations of public policy." *Kurtzman*, 347 N.C. at 334, 493 S.E.2d at 423.

Whether the complaint *sub judice* states a claim for wrongful discharge is dependent upon whether plaintiff's termination because she "advis[ed] the family of [a] patient that they should consider changing

physicians for the patient" violated the public policy of North
Carolina as set forth in the Nursing Practice Act (NPA), N.C.G.S.
§§ 90-171.19—90-171.47 (1993),[1] and the administrative regulations
promulgated thereunder.

G.S. § 90-171.19 expressly provides:

> The General Assembly of North Carolina finds that manda-
> tory licensure of all who engage in the practice of nursing is *nec-
> essary to ensure minimum standards of competency and to
> provide the public safe nursing care.*

(emphasis added). Further, G.S. § 90-171.21 creates a "Board of
Nursing" (the Board) charged, *inter alia*, with setting minimum
standards for educational programs preparing persons for licen-
sure under the Act, and with licensing qualified applicants, G.S.
§ 90-171.23(b)(6), (8). In addition, the Board oversees disciplinary
action under the NPA, "caus[ing] the prosecution of all persons vio-
lating [provisions of the Act]," G.S. § 90-171.23(b)(7), and is author-
ized to revoke or suspend the license of a registered nurse or appli-
cant who:

> (4) Engages in conduct that endangers the public health;
>
> (5) Is unfit or incompetent to practice nursing by reason of delib-
> erate or negligent acts or omissions regardless of whether actual
> injury to the patient is established; [or]
>
> . . . .
>
> (7) Has violated any provision of [the NPA].

N.C.G.S. § 90-171.37 (Supp. 1995).

Finally, included among administrative rules governing the nurs-
ing profession are regulations establishing minimum standards for
accredited programs of professional nursing, N.C. Admin. Code Tit.
21, r. 36.0300—36.0325 (Dec. 1994), and enumerating the "compo-
nents of nursing practice," N.C. Admin. Code Tit. 21, r. 36.0224 (Dec.
1994).

The NPA and attendant administrative regulations thus evidence
a clear public policy in North Carolina to protect public safety and
health by maintaining minimum standards of nursing care. *See*

---

1. The pertinent provisions of the NPA cited herein and applicable to the case *sub
judice* have not been substantively amended by the version of the NPA now in effect.

**DEERMAN v. BEVERLY CALIFORNIA CORP.**

[135 N.C. App. 1 (1999)]

*Winkelman v. Beloit Memorial Hosp.*, 483 N.W.2d 211, 215-16 (Wis. 1992) (statutes and administrative regulations governing practice of nursing held to represent public policy in wrongful termination action), and *Kirk v. Mercy Hosp. Tri-County*, 851 S.W.2d 617, 622 (Mo. Ct. App. 1993) (Missouri NPA and regulations thereunder "reveal a clear mandate of public policy . . . to train and license a person to engage in the safe and competent practice of nursing").

Plaintiff maintains her termination by defendant contravened this public policy, asserting in her appellate brief that

[b]y terminating [plaintiff], the defendant was preventing her from doing that which she was required to do by North Carolina statutes and regulations as a registered nurse.

Plaintiff specifically references G.S. § 90-171.20(4) which defines "Nursing" as:

a dynamic discipline which includes the caring, counseling, teaching, referring and implementing of prescribed treatment in the prevention and management of illness . . . .

Plaintiff also points to G.S. § 90-171.20(7) which provides:

The "practice of nursing by a registered nurse" consists of . . .

a. Assessing the patient's physical and mental health, including the patient's reaction to illnesses and treatment regimens; [and]

. . . .

g. Providing teaching and counseling about the patient's health care . . . .

Lastly, plaintiff cites administrative regulations concerning teaching and counseling about the patient's health care. In pertinent portion, these regulations provide:

(h) *Teaching and Counseling clients is the responsibility of the registered nurse,* consistent with G.S. 90-171.20(7)g.

(1) teaching and counseling consist of providing accurate and consistent information, demonstrations and guidance to clients, *their families or significant others* regarding the client's health status and health care for the purpose of:

(A) *increasing knowledge;*

(B) *assisting the client to reach an optimum level of health functioning and participation in self care;* and

(C) promoting the client's ability to make informed decisions.

(2) teaching and counseling include, but are not limited to:

(A) *assessing the client's needs and abilities;*

(B) adapting teaching content and methods to the identified needs and abilities of the client(s);

(C) evaluating effectiveness of teaching and counseling; and

(D) *making referrals to appropriate resources.*

N.C. Admin. Code Tit. 21, r. 36.0224(h) (Dec. 1994) (emphasis added) [hereinafter Rule 36.0224(h)].[2]

Plaintiff's public policy argument may thus fairly be summarized as follows: (1) the NPA and regulations of the Board of Nursing describe the practice of nursing as "assessing," G.S. § 90-171.20(7), a patient's health, which entails a "responsibility" to communicate, "counsel," and "provid[e] accurate . . . guidance to clients [and] their families," Rule 36.0224(h); (2) plaintiff's comments which resulted in her termination were proffered in fulfillment of the foregoing responsibilities; and (3) termination of plaintiff for fulfilling her responsibilities as a practicing nurse in North Carolina therefore violated the public policy of this State.

Defendant vigorously retorts that plaintiff's argument is fallacious. Defendant insists the NPA and the regulatory language upon which plaintiff relies "do[] not impose any requirements or express any prohibitions" and that, even should this Court rule to the contrary, the statements of plaintiff which led to her termination were not "required" by the NPA and regulations thereunder. We disagree.

While the language of the NPA and attendant regulations is broad and frequently expressed with a definitional bias, we are not persuaded by defendant's contention that neither the statutes nor regulations issued thereunder "impose any requirements or express any prohibitions" relevant to plaintiff's cause herein. For example, G.S. § 90-171.19 recites the purpose of the NPA and the licensure of

---

2. This portion of the regulation has not been subsequently amended.

persons in the practice of nursing as being to "ensure minimum standards of competency and to provide the public safe nursing care."

To the foregoing end, the NPA defines the "practice of nursing by a registered nurse" as "[p]roviding teaching and counseling about the patient's health care." G.S. § 90-171.20(7). Explanatory regulations further provide that "Teaching and Counseling clients is the responsibility of the registered nurse" and consists of "providing accurate and consistent information . . . and guidance to clients [and] their families." Rule 36.0224(h). Moreover, the regulations also note that "teaching and counseling include . . . making referrals to appropriate resources." *Id.*

In addition, the Board is required to initiate

an investigation upon receipt of information about any practice that might violate any provision of [the NPA] or any rule or regulation promulgated by the Board.

G.S. § 90-171.37. The Board is also empowered to take disciplinary action if it determines, *inter alia*, that a nurse "[i]s unfit or incompetent to practice nursing," *id.*, which by statute "includes the caring, counseling, teaching, referring and implementing of prescribed treatment," G.S. § 90-171.20(4), and by regulation incorporates the "responsibility" to "provid[e] accurate and consistent information . . . and guidance to clients [and] their families." Rule 36.0224(h).

The extensive legislative scheme described herein, including regulations adopted thereunder, thus reflects that our General Assembly intended by law to require of licensed nurses a measure of "teaching and counseling," G.S. § 90-171.20(7), so as to "ensure minimum standards of competency and to provide the public safe nursing care." G.S. § 90-171.19. Accordingly, defendant's contention that registered nurses in effect may choose to teach and counsel, but are not obligated to do so by law, misses the mark. In addition, defendant fails to account for the General Assembly's expression of the necessity of ensuring a "minimum" level of "competent" nursing care to provide for the public health. *See id.*

Defendant interjects that plaintiff in any event was not required to advise her patient's family that "she would reconsider the choice of physicians." On the contrary, as observed above, the NPA includes "teaching and counseling" as a function of the practice of nursing. *See* G.S. § 90-171.20(7). As such, plaintiff was obligated under the facts herein to provide "teaching and counseling" to her patient or the

patient's family "regarding the client's health status and health care for the purpose of (A) increasing knowledge; (B) assisting the client to reach an optimum level of health functioning . . . ; [and] (D) making referrals to appropriate resources." Rule 36.0224(h).

Interestingly, had plaintiff allegedly been terminated in consequence of her *refusal* to violate the minimal requirements of her position as described by the General Assembly and the Board, a claim for wrongful termination would clearly lie, *see Coman*, 325 N.C. at 175-76, 381 S.E.2d at 447 (truck driver who refused to violate laws regarding maximum driving hours stated claim for wrongful termination), because our state's public policy mandates "minimum standards of competency" for "safe nursing care." G.S. § 90-171.19. We perceive no legally cognizable distinction between the foregoing circumstance and the allegation that plaintiff was terminated solely for the reason that she *complied* with statutorily and administratively proscribed minimal competency standards. *Compare Sides*, 74 N.C. App. at 342-43, 328 S.E.2d at 826-27 (wrongful termination claim valid where nurse terminated after refusing employer's instructions to lie under oath in violation of state statute prohibiting false testimony); *Williams*, 91 N.C. App. at 41-42, 370 S.E.2d at 426 (valid wrongful termination claim presented where nurse terminated after having testified truthfully under subpoena at unemployment hearing); *Lenzer v. Flaherty*, 106 N.C. App. 496, 514-15, 418 S.E.2d 276, 287, *disc. review denied*, 332 N.C. 345, 421 S.E.2d 348 (1992) (wrongful termination claim proper where state-employed nurse terminated for reporting patient abuse as mandated by state statute); and *Caudill v. Dellinger*, 129 N.C. App. 649, 656-57, 501 S.E.2d 99, 104 (1998), *aff'd*, 350 N.C. 89, 511 S.E.2d 304 (1999) (valid claim for wrongful termination when forecast of evidence established employee terminated for giving truthful information about employer-district attorney's bank account to State Bureau of Investigation).

We therefore conclude that the allegations of plaintiff's complaint, taken as true, *see Sutton*, 277 N.C. at 98, 176 S.E.2d at 163, and liberally construed, *see Dixon*, 85 N.C. App. at 340, 354 S.E.2d at 758, support her contention that the statements which led to her termination were proffered in fulfillment of her "teaching and counseling" obligations as a licensed nurse. Plaintiff was the "Care Plan Coordinator" and "responsible for managing medical care and treatment for all patients at the Defendant's facility," and when one such patient "began losing weight, having hallucinations, psychiatric symptoms and acute distress," plaintiff "documented and reported all of

the patient's medical difficulties to the patient's physician." Nevertheless, her "attempt[s] to contact the patient's physician by telephone" proved uneventful since "the physician would not return her telephone calls." According to the complaint, plaintiff thereafter

> was contacted by a member of the patient's family regarding the patient's difficulties and deteriorating condition; after the Plaintiff advised the patient's family as to her concerns, one of he family members asked for the Plaintiff's advice as to what should be done for the patient and the Plaintiff advised that she would reconsider the choice of physicians in that the appropriate treatment had not been provided for her by her physician.

We deem it significant that plaintiff's comments were not alleged to have been gratuitous, but rather that she was specifically sought out by the patient's family members who solicited plaintiff's opinion concerning "what should be done for the patient," thereby invoking her "responsibility" to "provid[e] accurate and consistent information" to the patient's family, and to "mak[e] referrals to appropriate resources." Rule 36.0224(h).

Particularly in light of the further allegation that plaintiff was unable to reach the patient's physician about the patient's "deteriorating" condition, plaintiff's expression of opinion in response to inquiry by the patient's family as to what *plaintiff* would consider may be regarded as "teaching and counseling" under the NPA and pertinent regulations which was required to fulfill her "responsibility" to "provid[e] accurate and consistent information . . . and guidance to clients [and] their families." *Id.* At a minimum, we cannot say at this juncture as a matter of law that plaintiff's response was *not* required by the laws regulating licensed nurses. *See Wilmoth*, 127 N.C. App. at 261, 488 S.E.2d at 630 ("complaint should not be dismissed for failure to state a claim upon which relief can be granted unless it discloses on its face an insurmountable bar to recovery").

Finally, we believe plaintiff's complaint adequately set forth that her termination by defendant was "motivated by [a] . . . reason or purpose that is against public policy." *See Garner v. Rentenbach Constructors, Inc.*, 350 N.C. 567, 572, 515 S.E.2d 438, 441 (1999). Plaintiff alleged, and indeed defendant does not deny, that plaintiff was fired because of the advice she provided to the patient's family.

In sum, we conclude as follows: If plaintiff, as alleged, was terminated for meeting the minimum requirements of the practice of nursing as established and mandated by the NPA and regulations thereunder, then such termination violated the public policy of this state to ensure the public a minimum level of safe nursing care. Plaintiff's complaint, taken as true, *see Sutton*, 277 N.C. at 98, 176 S.E.2d at 163, and liberally construed, *see Dixon*, 85 N.C. App. at 340, 354 S.E.2d at 758, sufficiently alleged such termination, *see Roberts*, 124 N.C. App. at 722, 478 S.E.2d at 815 (whether plaintiff was fired "solely" because she refused "to violate the statutory notice requirement" and was thereby terminated in contravention of public policy is a question for the jury). The trial court therefore erred in granting defendant's Rule 12(b)(6) motion.

In that we have determined plaintiff's complaint adequately alleged she was discharged for complying with minimum requirements of the practice of nursing, we reject defendant's argument that the complaint established as a matter of law the unauthorized practice of medicine by plaintiff under N.C.G.S. § 90-18 (Supp. 1995). That section specifically exempts from activities constituting the practice of medicine "[t]he practice of nursing by a registered nurse engaged in the practice of nursing." G.S. § 90-18(14).[3]

Prior to concluding, we also briefly address defendant's assertion that a decision such as that reached herein might be extended to any employment "regulated or licensed by the state." To the contrary, our ruling is in keeping with the underlying purpose of recognizing public policy exceptions only in instances of "substantial justification grounded in compelling considerations of public policy." *Kurtzman*, 347 N.C. at 334, 493 S.E.2d at 423. The public policy recognized herein, *i.e.*, the protection of public safety and health by ensuring a competent level of nursing care, is equally as compelling as that acknowledged in *Coman*, namely, the protection of "persons and property on or near the public highways." *Coman*, 325 N.C. at 176, 381 S.E.2d at 447.

Reversed.

Judges WALKER and McGEE concur.

---

3. This section was re-designated in 1997 as G.S. § 90-18(c)(14).