**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 23-1406**

———————

KIM SHOOK; KYLIE SCOLARO-CONTI; JOHN J. SZWYD,

        Plaintiffs – Appellants,

    v.

NCG ACQUISITION, LLC, d/b/a Appalachian Community Services; NCG CARE, INC., a/k/a ncgCARE,

        Defendants – Appellees.

———————

Appeal from the United States District Court for the Western District of North Carolina, at Asheville.  Martin K. Reidinger, Chief District Judge.  (1:22-cv-00065-MR-WCM)

———————

Argued:  May 10, 2024                         Decided:  August 14, 2024

———————

Before THACKER, BENJAMIN, and BERNER, Circuit Judges.

———————

Reversed and remanded by published opinion. Judge Berner wrote the opinion, in which Judge Thacker and Judge Benjamin joined.

———————

**ARGUED:** Chris William Haaf, WALDREP WALL BABCOCK & BAILEY PLLC, Winston-Salem, North Carolina, for Appellants.  Matthew Traynham Anderson, WILLIAMS MULLEN, Richmond, Virginia, for Appellees.  **ON BRIEF:** Mark R. Sigmon, MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC, Raleigh, North Carolina, for Appellants.  Edward S. Schenk III, Raleigh, North Carolina, Laura D. Windsor, WILLIAMS MULLEN, Richmond, Virginia, for Appellees.

———————

BERNER, Circuit Judge:

North Carolina adheres to the presumption of "at-will" employment. This means that, unless otherwise agreed upon by employment contract or a collective bargaining agreement, an employee may generally be terminated for no reason, or even for an arbitrary or irrational reason. While applicable in most cases, this presumption is not inviolate. To the contrary, it is subject to a number of exceptions, some statutory and others developed through common law. Wrongful termination in violation of public policy is one such common law exception. The North Carolina Supreme Court explained the importance of protecting employees against termination in violation of public policy:

> [T]here can be no right to terminate [an at-will employee] for an unlawful reason or purpose that contravenes public policy. A different interpretation would encourage and sanction lawlessness, which law by its very nature is designed to discourage and prevent.

*Coman v. Thomas Mfg. Co.*, 381 S.E.2d 445, 447 (N.C. 1989) (quoting *Sides v. Duke Univ.*, 328 S.E.2d 818, 826 (N.C. App. 1985)). This case asserts a cause of action under the public policy exception to the at-will presumption.

Kim Shook, Kylie Scolaro-Conti, and John Szwyd (we will refer to them as "the Counselors") are licensed substance use disorder professionals who worked for NCG Acquisition, LLC and NCG CARE, Inc. (collectively referred to here as "NCG"). The Counselors allege that NCG terminated their employment in contravention of the laws governing their profession, specifically the North Carolina Substance Use Disorder Professional Practice Act ("SUDPPA") and its attendant regulations. The district court dismissed the Counselors' complaint, ruling they failed to allege a plausible claim for relief

2

under North Carolina law. We conclude that SUDPPA constitutes an express public policy of the State of North Carolina, and the Counselors plausibly allege in the complaint that they were terminated in violation of this express public policy. Accordingly, we reverse the district court's order and remand for further proceedings.

## I. Background

### A.

NCG owns and operates facilities in North Carolina that provide mental health counseling and substance use disorder treatment and recovery services.[1] The Counselors worked together to provide such services at several NCG facilities in western North Carolina.

As substance use disorder professionals, the Counselors were at times called upon to act as first responders for clients in crisis. When working with such clients, the Counselors would develop a crisis prevention and intervention plan, which they subsequently followed to address the clients' medical needs.

Crisis prevention and intervention plans include an assessment of the necessary level of care for the client. Levels of care are standards established by the American Society of Addiction Medicine. Under these standards, intensive outpatient treatment, like that provided by the Counselors, is deemed "Level II" care. J.A. 13. "Level III" care is a higher level of care than Level II care and generally includes inpatient hospitalization. J.A. 13.

---

[1] The facts are recited as alleged in the Counselors' complaint. Because this is an appeal from an order granting a motion to dismiss, we accept the factual allegations in the complaint as true. *De'lonta v. Johnson*, 708 F.3d 520, 522 (4th Cir. 2013).

3

In March 2021, Shook received a phone call from a client ("the Client"). The Client was experiencing extreme mental distress and was not following her prescribed treatment program. Shook conferred with Scolaro-Conti and together they developed a crisis prevention and intervention plan. The plan required the Client to seek immediate intensive outpatient treatment. Unfortunately, the Client refused to do so. Because the Client was both in distress and refusing to comply with the crisis prevention and intervention plan, Shook and Scolaro-Conti reassessed the Client's needs and determined she needed to be moved to inpatient treatment.

Shook then contacted the Client's probation officer to discuss next steps. The probation officer informed Shook that in order to move the Client to inpatient hospitalization he would need a letter from NCG discharging the Client from NCG's care and recommending the move. Shook and Scolaro-Conti notified Szwyd, their clinical supervisor, of the situation. The three Counselors agreed Scolaro-Conti would prepare a draft letter recommending that the Client be moved to inpatient hospitalization.

NCG policy required letters of this kind be approved in advance and co-signed by Assistant Director of Outpatient and Community-Based Services Jessica Tewell. Thus, Scolaro-Conti sent the draft letter to Tewell. Rather than approving Scolaro-Conti's draft, Tewell replaced certain clinical information with false and inaccurate information. Critically, Tewell modified the treatment recommendation for the Client from a "higher level of care" to a "different level of care." J.A. 13. Without a recommendation for a "higher level of care," the Client could not be moved to inpatient hospitalization, which the Counselors believed was clinically indicated.

4

Concerned about the Client's well-being, the Counselors attempted repeatedly for over a week to persuade Tewell to approve their recommendation of a "higher level of care" for the Client. Tewell steadfastly refused, even after the Client's probation officer reminded NCG that the Client would be ineligible for inpatient hospitalization without this recommended change. Left with no alternative, Shook sent the letter as modified by Tewell which recommended a "different level of care," rather than a "higher level of care." As a result, the Client was not moved to inpatient treatment.

Three days after Shook sent the letter, the Client died of a drug overdose. Szwyd informed Tewell about the Client's death and directed Shook to complete an incident report. Shook was the only NCG employee with first-hand knowledge of the Client's condition. Shook was precluded from completing an incident report, however, because Tewell insisted upon completing the incident report herself. Tewell did so without any direct knowledge of the Client's condition and without conferring with Shook or the other Counselors.

The Counselors were concerned that Tewell's refusal to approve the letter recommending a "higher level of care" may have contributed to the Client's death because this omission prevented the Client from being moved to inpatient hospitalization. To prevent such occurrences from happening in the future, Szwyd shared the concerns about Tewell's actions with a higher-level manager at NCG, Regional Director Ron Ross. Szwyd informed Ross that, in the Counselors' view, Tewell's refusal to approve their recommendation for a higher level of care was contraindicated under the circumstances.

5

Ross responded to Szwyd's concerns with a warning: "if I were you, I would watch what you say and who you say it to." J.A. 14. Shocked by this response, Szwyd asked whether he should have reported the matter to someone else. Ross responded that he was, in fact, the right person to receive the report and informed Szwyd that the matter would be investigated internally.

Nine days after Szwyd told Ross about Tewell's actions, NCG terminated the Counselors.

## B.

Several months after they were terminated, the Counselors filed a complaint with the North Carolina Department of Health and Human Services about Tewell's refusal to approve their draft letter, including the recommendation of inpatient hospitalization. The Department conducted an unannounced investigation of NCG's facilities and found Tewell had violated North Carolina law. The Department determined that:

> [Tewell] failed to demonstrate competency – she failed to sign a letter for [the Client] that was requested by probation and forwarded to her by Substance Abuse Intensive Outpatient Program ("SAIOP") staff referencing a need for a higher level of care for 7 business days, from 3/22/21–4/2/21 and edited information in the letter; the edited information included inaccuracies regarding lack of progress in the program, and a recommendation for a different service that was not recommended by the clinicians; [Tewell] based her edits upon review of the client record. She had never met [the Client].

JA17.

6

## II. Procedural History

### A.

The Counselors filed suit in the Western District of North Carolina alleging wrongful termination in violation of public policy. Specifically, they allege that they were terminated in contravention of the North Carolina Substance Use Disorder Professional Practice Act, N.C. Gen. Stat. § 90-113.30, *et seq.*, and its attendant regulations, 21 N.C. Admin. Code 68.0507 ("Rule 68.0507"); 21 N.C. Admin. Code 68.0503(a) ("Rule 68.0503(a)"); and 21 N.C. Admin. Code 68.0503(h) ("Rule 68.0503(h)").

SUDPPA governs the practice of substance use disorder professionals in North Carolina. It was enacted:

> to safeguard the public health, safety, and welfare, to protect the public from being harmed by unqualified persons, to assure the highest degree of professional care and conduct on the part of credentialed substance use disorder professionals, to provide for the establishment of standards for the education of credentialed substance use disorder professionals, and to ensure the availability of credentialed substance use disorder professional services of high quality to persons in need of these services.

N.C. Gen. Stat. § 90-113.30. SUDPPA created and empowered the North Carolina Addictions Specialist Professional Practice Board ("Board"), N.C. Gen. Stat. §§ 90-113.32, 90-113.33; established licensing requirements, N.C. Gen. Stat. § 90-113.40; and created professional guidelines, N.C. Gen. Stat. §§ 90-113.42, 90-113.44. Significantly, SUDPPA requires substance use disorder professionals to comply with its attendant regulations, N.C. Gen. Stat. § 90-113.44(a)(6), which set out the professional requirements for substance use disorder professionals. *See* 21 N.C. Admin. Code 68.0500, *et seq*.

7

B.

The district court dismissed the Counselors' wrongful termination claim for failure to state a plausible claim for relief. *Shook v. NCG Acquisition, LLC*, No. 1:22-CV-65-MR-WCM, 2022 WL 18893035 (W.D.N.C. Dec. 7, 2022), *report and recommendation adopted*, No. 1:22-CV-00065-MR-WCM, 2023 WL 2496179 (W.D.N.C. Mar. 14, 2023). The district court agreed with the Counselors that SUDPPA and its attendant regulations are an expression of the public policy of the State of North Carolina. *Id.* at *5, *8. The district court concluded, however, that the Counselors failed to adequately plead that NCG terminated them in contravention of SUDPPA. *Id.* at *8–*9. The district court limited its analysis to whether the Counselors adequately pled a claim for termination in contravention of two specific SUDPPA regulations, 21 N.C. Admin. Code 68.0503(d) ("Rule 68.0503(d)") and 21 N.C. Admin. Code 68.0503(e) ("Rule 68.0503(e)"), neither of which is specifically referenced in the complaint.

The district court first analyzed whether the Counselors sufficiently alleged that their termination contravened SUDPPA Rule 68.0503(e). That rule requires a "substance use disorder professional who knows of unethical conduct . . . by a substance use disorder professional [to] report such violations to the Board." 21 N.C. Admin. Code 68.0503(e). The district court observed that the Counselors filed an official report about Tewell's conduct, but they did so several months after they were terminated. *Shook*, 2022 WL 18893035, at *8. Because they had yet to report to the Board at the time of their termination, the district court concluded that the termination could not have been in retaliation for filing a report pursuant to Rule 68.0503(e). *Id.* at *8–*9.

8

The district court next analyzed the Counselors' claim for wrongful termination in contravention of Rule 68.0503(d). That rule requires substance use disorder professionals to "assist in eliminating prevention, intervention, treatment, and supervision practices by persons unqualified or unauthorized to practice in the field." 21 N.C. Admin. Code 68.0503(d). The district court emphasized that the Counselors failed to allege that Tewell was either "unqualified" or "unauthorized to practice in the field." *Shook*, 2022 WL 18893035, at *9. Because the Counselors did not invoke the precise words in the rule, the district court concluded they failed to allege a plausible claim for termination in contravention of Rule 68.0503(d). *Id.*

Though noting the outcome was a "close call," the district court granted NCG's motion to dismiss the Counselors' claim for wrongful termination in violation of public policy, finding neither SUDPPA Rule 68.0503(d) nor Rule 68.0503(e) was contravened by the facts alleged in the complaint. *Id.* at *8–*10. Critically, the district court never analyzed the Counselors' claims under the SUDPPA rules specified in the complaint, Rules 68.0507, 68.0503(a), and 68.0503(h).

## III. Standard of Review

We review *de novo* a district court's decision to grant a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See, e.g.*, *Rockville Cars, LLC v. City of Rockville*, 891 F.3d 141, 145 (4th Cir. 2018). At the pleading stage we evaluate only whether the complaint states a plausible claim for relief. *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 268 (4th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). We accept the allegations in the complaint as true and draw all reasonable

9

inferences in favor of the plaintiffs. *See Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 287–88 (4th Cir. 2021).

## IV. Analysis

When a plaintiff alleges wrongful termination in violation of public policy under North Carolina law, the inquiry at the pleading stage is two-fold. First, does the complaint identify a specific North Carolina public policy that the employer allegedly contravened in terminating the employee? *Considine v. Compass Grp. USA, Inc.*, 551 S.E.2d 179, 183–84 (N.C. App. 2001), *aff'd,* 557 S.E.2d 528 (N.C. 2001). Second, does the complaint make a plausible showing that the public policy was contravened? *Bigelow v. Town of Chapel Hill*, 745 S.E.2d 316, 324 (N.C. App. 2013) (quoting *Garner v. Rentenbach Constructors Inc.*, 515 S.E.2d 438, 441 (N.C. 1999)).

## A.

Turning to step one of our inquiry, we must determine whether the Counselors adequately identify "a specific expression of North Carolina public policy." *Horne v. Cumberland Cnty. Hosp. Sys., Inc.*, 746 S.E.2d 13, 18 (N.C. App. 2013) (quoting *Considine*, 551 S.E.2d at 184). While the public policy exception to the at-will presumption has been described as narrow, *see, e.g.*, *Considine*, 551 S.E. at 183, North Carolina's appellate courts have repeatedly affirmed that the North Carolina General Statutes and attendant regulations constitute the express public policy of the state. *Amos v. Oakdale Knitting Co.*, 416 S.E.2d 166, 169 (N.C. 1992) ("[A]t the very least public policy is violated when an employee is fired in contravention of express policy declarations contained in the

North Carolina General Statutes."); *see also Coman*, 381 S.E.2d at 447–48; *Bigelow*, 745 S.E.2d at 324.

This bright-line principle has been applied where, as here, health care professionals allege their employer terminated them in contravention of the statutes and regulations governing their profession. North Carolina appellate courts consistently find such statutes and regulations to be the express public policy of the state for the purpose of analyzing claims of wrongful termination in violation of public policy. *See, e.g.*, *Deerman v. Beverly Cal. Corp.*, 518 S.E.2d 804, 809 (N.C. App. 1999) (recognizing the Nursing Practice Act and its attendant regulations as the express public policy of North Carolina); *Salter v. E & J Healthcare, Inc.*, 575 S.E.2d 46, 51–52 (N.C. App. 2003) (recognizing the Adult Care Home Residents' Bill of Rights); *Lenzer v. Flaherty*, 418 S.E.2d 276, 287, *disc. rev. denied*, 421 S.E.2d 348 (N.C. App. 1992) (recognizing the Mental Health, Developmental Disabilities, and Substance Abuse Act).

In support of their public policy claim, the Counselors cite to SUDPPA broadly. They also reference three specific regulations promulgated under SUDPPA. The first, Rule 68.0507, establishes the basic requirements for maintaining client welfare. Subsections of Rule 68.0507 require substance use disorder professionals to "protect the safety and welfare of the client," 21 N.C. Admin. Code 68.0507(a), even "in the presence of professional conflict," *id.* § 68.0507(c), and to "collaborate with other health care professionals providing treatment or support services to a client," *id.* § 68.0507(i). The Counselors also point to two subsections of Rule 68.0503, which sets forth competency requirements for substance use disorder professionals. *Id.* § 68.0503. Rule 68.0503(a)

11

requires substance use disorder professionals to "employ their knowledge, skill and proficiencies within their scope of practice." *Id.* § 68.0503(a). Rule 68.0503(h) requires substance use disorder professionals to "complete reports and record keeping functions in a manner that supports the client's treatment experience and welfare." *Id.* § 68.0503(h). These regulations are all requirements of the Counselors' profession and failure to comply with any of them could lead to discipline by the Board, including the potential loss of the Counselors' professional licenses. N.C. Gen. Stat. §§ 90-113.33(2), 90-113.44(a)(6).

Because the provisions of SUDPPA and its attendant regulations specified by the Counselors in the complaint govern their profession, we agree with the district court that they constitute an expression of North Carolina public policy. Accordingly, we find that the Counselors meet their burden under the first step of our inquiry.

B.

Although NCG apparently agrees with our conclusion, Appellee's Resp. Br. at 27 ("It is without argument that the SUDPPA sets forth the public policy of North Carolina that the public be protected from unqualified individuals from treating substance use disorders."), NCG argues that it would not be appropriate for us, as a federal court sitting in diversity jurisdiction, to be the first court to recognize SUDPPA as the express public policy of North Carolina, *id.* at 25–26 (citing *Washington v. Union Carbide Corp.*, 870 F.2d 957, 962 (4th Cir. 1989)). We disagree. While it would be improper for us to expand state law, applying it is squarely within our purview. *See, e.g.*, *Stahle v. CTS Corp.*, 817 F.3d 96, 100 (4th Cir. 2016) ("[O]ur task here is to anticipate whether the Supreme Court of North Carolina would rule that [a statute] bars [plaintiff's] action.").

12

This court's ruling in *Washington* exemplifies this distinction. There, the employee sued his former employer for termination in violation of public policy after the employer allegedly retaliated against him for filing safety complaints. *Washington*, 870 F.2d at 958. West Virginia, like North Carolina, requires a claim of retaliatory discharge to "rest upon a statutory articulation of public policy by the West Virginia legislature." *Id.* at 963. Yet the employee failed to specify a source of express public policy that had allegedly been contravened by the employer. *Id.* Because the employee failed to point to any "West Virginia statute or case recognizing a 'public policy' in favor of private sector employees who file safety complaints with their employers," this court concluded that he failed to state a plausible claim. *Id.* This court noted, however, that identifying a state statute would have been sufficient. *Id*. (stating that the "presence of [state] statutes was the critical factor in identifying the state's public policy").

Here, unlike in *Washington*, the Counselors met their burden to identify a specific source of public policy. As we have explained, North Carolina's appellate courts have repeatedly held that state statutes and regulations constitute express public policy. *See, e.g., Amos*, 416 S.E.2d at 169. We apply the principles laid down by North Carolina's courts and recognize SUDPPA and its attendant regulations as the express public policy of North Carolina.[2]

---

[2] We also reject NCG's attempt to justify dismissal of the Counselors' case by asking us to consider its proffered reasons for terminating the Counselors. This we cannot do. It is well-established that courts must not entertain factual disputes on a Rule 12(b)(6) motion to dismiss. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 449 (4th Cir. 2011). These arguments must be saved for a later stage in the litigation.

13

C.

Having established that SUDPPA and its attendant Rules 68.0507, 68.0503(a), and 68.0503(h) constitute an express public policy of North Carolina, we move to the second step of our inquiry: whether the Counselors plausibly allege facts showing that NCG terminated them in contravention of this public policy. To do so, the Counselors "need only to allege facts sufficient to support a claim that their firing was 'motivated by an unlawful reason or purpose that is against [that] policy.'" *Bigelow*, 745 S.E.2d at 324 (quoting *Garner*, 515 S.E.2d at 441). We therefore analyze the sufficiency of the Counselors' allegations in reference to the rules specified in their complaint. [3]

i.

In conducting this analysis, we look to the North Carolina Court of Appeals' ruling in *Deerman v. Beverly California Corporation*, a case on all fours with this one. The plaintiff, Dixie Deerman, was a registered nurse caring for a patient experiencing serious medical complications. *Deerman*, 518 S.E.2d at 805. Deerman believed the patient's attending physician had failed to provide adequate care and monitoring. *Id.* When the patient's family contacted Deerman, she shared her concerns about the physician's care. *Id.* Deerman ultimately advised the patient's family to change physicians. *Id.* When the employer discovered what Deerman had done, the employer promptly terminated her "for

---

[3] We do not address the district court's conclusion that the Counselors failed to allege a plausible claim that NCG's actions contravened SUDPPA Rule 68.0503(d) and Rule 68.0503(e). These regulations are not referenced in the Counselors' complaint, and the Counselors do not rely upon them in this appeal. We disagree with the district court, however, in its conclusion that filing an internal report of unethical conduct could never suffice to demonstrate compliance with Rule 68.0503(e).

14

vocalizing to a patient's family member her criticisms of the treatment provided to the patient by the attending physician." *Id.* at 805–06.

Deerman sued her employer for wrongful termination in violation of public policy, alleging that she had been terminated in contravention of the North Carolina Nursing Practice Act (NPA), N.C. Gen. Stat. §§ 90-171.19 to 90-171.47, and its attendant regulations. *Deerman*, 518 S.E.2d at 807. Much like SUDPPA, the NPA regulates the "mandatory licensure of all who engage in the practice of nursing" in order "to ensure minimum standards of competency and to provide the public safe nursing care." N.C. Gen. Stat. § 90-171.19. Also, like SUDPPA, the NPA created a board charged with setting licensure standards. *Id.* § 90-171.21.

On the first step of the wrongful termination analysis, the North Carolina Court of Appeals determined that the NPA and attendant regulations set out "a clear public policy in North Carolina to protect public safety and health by maintaining minimum standards of nursing care." *Deerman*, 518 S.E.2d at 807. The NPA establishes that the "practice of nursing by a registered nurse" includes "[p]roviding teaching and counseling about the patient's health care." N.C. Gen. Stat. § 90-171.20(7). The NPA's regulations also make clear that "[t]eaching and Counseling clients is the responsibility of the registered nurse" and consists of "providing accurate and consistent information . . . and guidance to clients [and] their families." 21 N.C. Admin. Code 36.0224(h).

Turning to the adequacy of the pleadings on the second step, the court reasoned that if Deerman, "as alleged, was terminated for meeting the minimum requirements of the practice of nursing as established and mandated by the NPA and regulations thereunder,

15

then such termination violated the public policy of this state to ensure the public a minimum level of safe nursing care." *Id.* at 810. The court held that Deerman's advice to the patient's family demonstrated compliance with the NPA and its attendant regulations. *Id.* Because Deerman alleged she was terminated in retaliation for complying with an express policy of North Carolina, the court denied the employer's motion to dismiss. *Id.*

ii.

The similarities between this case and *Deerman* are readily apparent and mandate the same result. Like the plaintiff in *Deerman*, the Counselors are governed by a regulatory scheme which establishes standards of their profession. N.C. Gen. Stat. § 90-113.30. SUDPPA, like the NPA, created requirements for licensure, *id.* § 90-113.33, and its attendant regulations set the "standard for the substance use disorder professional in his or her professional roles, relationships, and responsibilities." 21 N.C. Admin. Code 68.0501. Just as Deerman was required to counsel her patient's family, the Counselors were required to protect the safety and welfare of their clients. *See id.* § 68.0507(a) (using the word "shall"). They were also required to employ their knowledge, skill and proficiencies, *id.* § 68.0503(a) (using the word "shall"), and to maintain accurate client records, *id.* § 68.0503(h) (using the word "shall"). Most relevant to our analysis, the North Carolina Court of Appeals found that Deerman plausibly alleged that her termination contravened the public policy of North Carolina "to ensure the public a minimum level of safe nursing care" because she claimed she was terminated in retaliation for complying with the NPA regulations governing the practice of nursing. *Deerman*, 518 S.E.2d at 810. Here too, the

16

Counselors allege they were terminated in retaliation for actions they took in furtherance of their professional obligations as established by state law.

The Counselors informed NGC Regional Director Ross about NCG Assistant Director Tewell's refusal to approve their recommended care plan. They told Ross that Tewell substantively changed the text of the draft letter to the probation officer in the face of repeated requests to leave the Counselors' recommendation as written. The Counselors also shared their view that these changes prevented the Client from being moved to inpatient treatment and may have contributed to her death.

NCG argues that Assistant Director Tewell's modification of the letter was purely "semantic," and the Counselors' wrongful termination claim hinges solely upon the change of "one word" in their draft letter. Appellees' Resp. Br. at 13. The allegations in the complaint demonstrate otherwise. The Counselors describe additional changes Tewell made to the letter, including replacing certain clinical information with inaccurate information.

Even if it were true that Tewell changed only one word in the letter, the Counselors allege that altering this particular word significantly impacted the Client's care. Not only is the distinction between a "higher level of care" and "different level of care" an obvious one — "different" can also mean a *lower* level of care — but also, inpatient hospitalization would only be available under a higher of level of care in accordance with the standards established by the American Society of Addiction Medicine. Inpatient hospitalization is

17

precisely what the Counselors had determined, in their professional opinion, was clinically indicated.[4]

In recommending the Client receive a higher level of care, the Counselors "employ[ed] their knowledge, skill and proficiencies within their scope of practice." 21 N.C. Admin. Code 68.0503(a). By bringing Tewell's actions to the attention of Regional Director Ross they sought to protect "the safety and welfare" of clients to prevent similar incidents in the future, *id.* § 68.0507(a), and plausibly "in the presence of professional conflict," *id.* § 68.0507(c), with their Assistant Director. The Counselors' discussions with Ross about Tewell's actions also plausibly show "collaborat[ion] with other health care professionals providing treatment or support services to a client." *Id.* § 68.0507(i).

The Counselors further allege they were terminated in retaliation for actions taken in compliance with Rule 68.0503(h), which requires substance use disorder professionals to "complete reports and record keeping functions in a manner that supports the client's treatment experience and welfare." *Id.* § 68.0503(h). After the Client died, the Counselors attempted to complete an incident report, as they were obligated to do under the rule requiring them to maintain accurate client records. The Counselors were precluded from completing this report, however, when Tewell interceded and drafted the incident report herself, despite having had no direct contact with the Client.

---

[4] The Client's probation officer was certainly aware of the importance of this distinction. He repeatedly asked for the letter to specify a "higher level of care." The North Carolina Department of Health and Human Services later also recognized this distinction in finding that Tewell "failed to demonstrate competency" by refusing to sign the letter "referencing a need for a higher level of care" and instead recommending a "different service that was not recommended by the clinicians." J.A. 17.

Based on the facts set forth in the complaint, we find the Counselors plausibly allege NCG terminated them in retaliation for complying with their professional obligations under SUDPPA and its attendant regulations. We therefore conclude that the Counselors satisfy the second step of our inquiry.

## V. Conclusion

Because the Counselors identify a specific public policy of the State of North Carolina and they allege facts sufficient to show their termination contravened this public policy, we hold the Counselors plausibly allege a cause of action for wrongful termination in violation of the express public policy of the State of North Carolina. We therefore reverse the order of the district court and remand for further proceedings.

*REVERSED AND REMANDED*